UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ANTHONY D. IZZI
Plaintiff

v.

UNITED PARCEL SERVICE, INC.
Defendant

**C.A. No: 04-321T**

July 29, 2005

## UNITED PARCEL SERVICE'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure the Defendant, United Parcel Service, Inc., hereby moves for summary judgment on all Counts of the Complaint.

In support of its Motion for Summary Judgment, the Defendant refer the Court to the Memorandum in Support of Defendant's Motion for Summary Judgment, Defendant's Statement of Facts, Defendant's Record of Materials and Defendant's Appendix of Legal Authorities, all filed herewith.

DEFENDANT - UNITED PARCEL SERVICE INC.

By Hugh F. Murray / (TMB) (#6228)
Hugh F. Murray, III - BBO#645595
Laurie Alexander-Krom - BBO #637385

Murtha Cullina LLP
99 High Street
Boston, MA 02110-2320
Telephone: (617) 457-4000
Facsimile: (617) 482-3868
Its Attorneys

By Timothy M. Bliss
Lori C. Silveira
Timothy Bliss (#6228)

Tillinghast Licht LLP
10 Weybosset Street
Providence, RI 02903
Telephone: (401) 456-1200
Facsimile: (401) 456-1210
Its Attorney

July 29, 2005

# CERTIFICATE OF SERVICE

I certify that a copy of United Parcel Service's Motion for Summary Judgment was mailed to plaintiff's counsel on the 29 day of July, 2005.

Carly Beauvais Iafrate, Esquire
170 Westminster Street
Suite 601
Providence, RI 02903

Laurie Alexander-Krom, Esquire
MURTHA CULLINA LLP
99 High Street
Boston, MA 02110-2320

Colleen M. Vandal

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANTHONY D. IZZI<br>Plaintiff | ) | |
| v. | ) | **C.A. No: 04-321T** |
| UNITED PARCEL SERVICE, INC.<br>Defendant | ) | July 29, 2005 |

<u>Memorandum in Support of Defendant's Motion for Summary Judgment</u>

Table of Contents

1. Description of Motion ........ 3
2. Facts ........ 4
3. Issues ........ 8
4. Points and Authorities ........ 8
A. Mr. Izzi is not "Disabled" Under Rhode Island Law. ........ 9
B. The Disparate Treatment Claims Should be Dismissed ........ 11
C. The Failure to Accommodate Claims Should be Dismissed ........ 12
i. The RICRA Has No Reasonable Accommodation Requirement ........ 12
ii. All the Failure to Accommodate Claims Fail ........ 12
a. Seniority Systems and Reasonable Accommodation ........ 14
b. National Labor Relations Act Preemption ........ 14
c. Fixed Route Assignment ........ 15
d. The Cover Driver Position ........ 16
Conclusion ........ 20

1. Description of Motion

Anthony Izzi works for United Parcel Service ("UPS"). The United States Department of Transportation ("DOT") requires any driver of a commercial motor vehicle weighing over 10,000 pounds to obtain a "DOT Card." Mr. Izzi is unable to obtain a DOT Card and thus federal regulations prohibit him from operating commercial motor vehicles in excess of 10,000 pounds. The vast majority of the work done by UPS Package Car Drivers in Rhode Island involves use of a vehicle over 10,000 pounds. Mr. Izzi, therefore, has not been able to work as a Package Car Driver and instead is a full-time inside employee of UPS.

Mr. Izzi claims that Rhode Island law requires UPS to create, specifically for him, a Package Car Driver position that would only use vehicles weighing 10,000 pounds or less. Mr. Izzi claims that because the reason federal law prohibits him from operating a vehicle over 10,000 pounds is because he is an insulin dependent diabetic, UPS is discriminating against him because of a "disability." In fact, there is no admissible evidence that Mr. Izzi is "disabled" under Rhode Island law. Even if he did meet the Rhode Island definition of "disability," Rhode Island law does not require UPS to create an under-10,000 pound Package Car Driver position under these circumstances. To do so would violate a bona fide seniority assignment system. Moreover, resolution of certain theories propounded by Mr. Izzi would necessarily require the interpretation of the collective bargaining agreement between UPS and Mr. Izzi's union, and therefore Mr. Izzi's state law claim is preempted by federal labor law. UPS, therefore, is entitled to Summary Judgment on all remaining counts of the complaint.

2. Facts

Consistent with the standard under Rule 56 of the Federal Rules of Civil Procedure, the following material facts are either undisputed or, if they are disputed, are stated in the light most favorable to Mr. Izzi. There are some facts set forth below that UPS would challenge at trial but accepts as true for purposes of this summary judgment motion.

Anthony Izzi began working at UPS in 1989 and remains employed at UPS today. Deposition of Anthony Izzi ("Izzi Depo.") at 7. For his entire tenure at UPS, Mr. Izzi has been represented for purposes of collective bargaining by Local 251 of the International Brotherhood of Teamsters ("Teamsters"). Plaintiff's Responses to Defendant's Request for Admissions ("Admissions") no. 9. The Teamsters and UPS have entered into a collective bargaining agreement ("Collective Bargaining Agreement") that provides for, among other things, assignment of positions within the bargaining unit on the basis of seniority. Admissions no. 10.

By 1996, Mr. Izzi had enough seniority to bid on and become a full-time Package Car Driver. Izzi Depo. at 8. Mr. Izzi's job as a package car driver involved operating one of the familiar brown UPS package deliver vehicles along various routes throughout the Providence, Rhode Island area. Routes are distributed to drivers through an annual bid system by which drivers bid on available routes on the basis of their seniority. Admissions no. 10. Drivers may choose either a fixed route, if the driver's seniority allows such a bid, or may become a "cover driver" operating different routes based on the needs of the operation on a given day. Izzi Depo. at 15; Deposition of Mark Murphy

April 13, 2005 ("Murphy Depo. I") at 147. During his time as a driver, Mr. Izzi had both fixed routes and acted as a cover driver.

The majority of UPS package cars in Rhode Island are over 10,000 pounds gross vehicle weight. Admissions no. 7. The United States Department of Transportation ("DOT") requires that drivers of commercial motor vehicles over 10,000 pounds meet certain standards and have a certification to that effect (a "DOT Card"). Admissions number 2, 3, 4, 5, and 7. DOT Cards must be renewed every two years. Izzi Depo. at 14.

Mr. Izzi's last successful renewal of his DOT card was in October, 2000. Izzi Depo. at 26. In October, 2002, Mr. Izzi attempted to renew his DOT Card. Id. at 34-35. Between October, 2000 and October, 2002, Mr. Izzi's diabetes had begun to be treated with insulin. Admissions no. 5. DOT regulations require that in order to obtain a DOT Card a person must have "no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control." 49 C.F.R. § 391.41(b) & Admissions no. 4. Mr. Izzi, therefore, was unable to obtain a valid DOT Card, and he remains without a valid DOT Card as of today. Because federal law prohibited Mr. Izzi from operating vehicles over 10,000 pounds, UPS removed Mr. Izzi from his Package Car Driver position, which had involved operating vehicles over 10,000 pounds. Under the Collective Bargaining Agreement, Mr. Izzi was able to bid on other jobs, and he has worked full time in a non-driving position since 2002. Izzi Depo. at 47.

UPS does have some vehicles that weigh less than 10,000 pounds and thus are not covered by the DOT regulations. UPS has developed a "Diabetes Protocol" to determine whether any particular driver who has diabetes controlled by insulin will be able to safely operate a vehicle under 10,001 pounds. Deposition of Julie Souza ("Souza Depo.") at 92.

UPS put Mr. Izzi through its Diabetes Protocol and determined that he could operate vehicles under 10,000 pounds. Souza Depo. at 95.

Smaller Vehicles are used by three different categories of UPS Drivers. Smaller Vehicles are used by Air Drivers. Air Drivers deliver UPS NextDayAir packages, which are generally smaller, have less volume and need to be delivered by 10:30 in the morning. Murphy Depo. I at 103. Air Drivers are not full time Package Car Drivers but are either part time employees or have a full time position that consists of both air driving and some non-driving work. Murphy Depo. I at 101. Air Drivers' pay rates are less than Package Car Drivers' pay rates and equal to the rates of non-driving inside positions, such as the ones Mr. Izzi has held since October 2002. Murphy Depo. I at 101. Since passing the Diabetes Protocol in 2003, Mr. Izzi has been eligible to bid on an Air Driver or Air Driver Combo job, but he has chosen not to.

A limited number of Smaller Vehicles may also be used by Package Car Drivers on fixed delivery routes. Assignment of fixed routes is governed by a seniority bidding process of the collective bargaining agreement between UPS and the Teamsters. Admissions no. 10. While there may be some dispute as to the exact number of fixed routes that use Smaller Vehicles on a regular basis and the extent to which drivers on those routes also need to be able to operate larger vehicles as an essential part of their job, such disputes are not material in this case because, however defined, such routes have only been filled by drivers with more seniority than Mr. Izzi.

Finally, Smaller Vehicles are on occasion used by Cover Drivers. A Cover Driver is a flexible position that fills in for vacationing, sick or injured employees and generally provides UPS with the flexibility needed to satisfy customer demands. Murphy Depo. I

at 147; Izzi Depo. at 15. Solely for purposes of Summary Judgment, UPS will accept Mr. Izzi's contention that on most days at least one Smaller Vehicle is operated by at least one of the Cover Drivers out of the Warwick facility. While there may be some dispute as to the amount of time any given Cover Driver operates a Smaller Vehicle, no single Cover Driver operates Smaller Vehicles for a majority of the year.

There is sparse evidence in the record concerning the effect of Mr. Izzi's diabetes on any major life activities. Mr. Izzi testified at his deposition about the effect his diabetes had on him, both before and after he started taking insulin. Izzi Depo. at 25-33. He testified that he lost weight, but that he could recall no other symptoms. Id. He testified that although he has experienced high blood sugar, he never noticed symptoms from high blood sugar other than having to urinate. Id. Mr. Izzi gave no evidence at all that his diabetes actually limited any major life activity, much less that any such limitation was "substantial." Mr. Izzi has not provided any expert testimony concerning the effect his diabetes would have on him if he were not taking insulin.

Mr. Izzi is represented for purposes of collective bargaining by Local 251 of the International Brotherhood of Teamsters, which has a collective bargaining agreement (the "Collective Bargaining Agreement") with UPS governing wages, hours and other terms and conditions of employment. Admissions number 9. Pursuant to certain provisions of the Collective Bargaining Agreement, package car routes are awarded by seniority during an annual bid. Admissions number 10.

Under the Collective Bargaining Agreement, if a route changes by more than 50% it becomes a new route subject to being re-bid. Deposition of Kevin Reddy ("Reddy Depo.") at 74-75. A new route that exists for 30 days becomes subject to bid. Article

57, Section 2(B)(1) of the Collective Bargaining Agreement provides that "any new job in existence for more than thirty (30) days shall be considered a permanent job." Deposition of Mark Murphy April 26, 2005 ("Murphy Depo. II") at 94.

3. Issues

1. Whether There is Any Evidence in the Record that Mr. Izzi is "Disabled" Under Rhode Island Law;

2. Whether the Undisputed Facts Entitle UPS to Summary Judgment on the Three Disparate Treatment Claims;

3. Whether the Undisputed Facts Entitle UPS to Summary Judgment on the Failure to Accommodate Claims, including (i) Whether the RICRA encompasses a duty to Accommodate; (ii) Whether Operating Vehicles over 10,000 pounds is an Essential Function of a UPS Package Car Driver; (iii) Whether Proposed Accommodations would Violate the Seniority System; and (iv) Whether Interpretation of the Terms of the Collective Bargaining Agreement is Necessary for the Resolution of Mr. Izzi's Claims.

4. Points and Authorities

Mr. Izzi claims that UPS has violated Rhode Island law by failing to allow him to be a Package Car Driver operating only Smaller Vehicles. The original Complaint dated June of 2004 contained Ten Counts. Counts 4, 5, 6 and 10, however, have been voluntarily dismissed. Counts 1-3 allege disparate treatment on the basis of disability in violation of R.I. Gen. Laws § 28-5-1 et seq. (Count 1), R.I. Gen. Laws § 42-112-1 et seq.

(Count 2) and R.I. Gen. Laws § 42-87-1 et seq. (Count 3). Counts 7-9 allege a failure to accommodate Mr. Izzi's disability under the same statutes.

UPS is entitled to summary judgment because (A) Mr. Izzi has no admissible evidence that he is "disabled" under the statutes cited; (B) There is no evidence of any disparate treatment against Mr. Izzi on the basis of any disability; (C) Creation of a "Small Vehicle Package Car Driver Position" is not a reasonable accommodation under Rhode Island law because (i) it would eliminate an essential function of the package car driver job; (ii) it would interfere with a bone fide seniority system; and (iii) resolution of the claim would require interpretation of the Collective Bargaining Agreement and thus be preempted by Federal labor law.

A. Mr. Izzi is not "Disabled" Under Rhode Island Law.

Counts one and seven arise under the Rhode Island Fair Employment Practices Act ("RIFEPA"), which defines "Disability" as:

> Any physical or mental impairment which substantially limits one or more major life activities, has a record of an impairment, or is regarded as having an impairment by any person, employer, labor organization or employment agency subject to this chapter, and includes any disability which is provided protection under the Americans with Disabilities Act, 42 U.S.C. 12101 et seq. and federal regulations pertaining to the act, 28 CFR 35 and 29 CFR 1630; provided, that whether a person has a disability shall be determined without regard to the availability or use of mitigating measures, such as reasonable accommodations, prosthetic devices, medications or auxiliary aids.

R.I. Gen. Laws § 28-5-6(4). Counts two and eight arise under the Rhode Island Civil Rights Act ("RICRA"), which incorporates the definition of "disability" from the RIFEPA. R.I. Gen. Laws § 42-112-1(d). Counts three and nine arise from the Rhode Island Civil Rights of People with Disabilities Act ("RICRPDA") defines a person with a disability as some one who "has a physical or mental impairment which substantially

limits one or more major life activities" and provides specifically that "whether a person has a disability shall be determined without regard to the availability or use of mitigating measures, such as reasonable accommodations, prosthetic devices, medications or auxiliary aids." R.I. Gen. Laws § 42-87-1(7) & (1).

Mr. Izzi's only "physical or mental impairment" at issue in this case is his diabetes. Mr. Izzi testified at his deposition about the effect his diabetes had on him, both before and after he started taking insulin. Izzi Depo. at 23-35. He testified that he lost weight, but that he could recall no other symptoms. Id. He testified that although he has experienced high blood sugar, he never had other symptoms from high blood sugar. Id. Mr. Izzi gave no evidence at all that his diabetes actually limited any major life activity, much less that any such limitation was "substantial." Under the federal Americans with Disabilities Act ("ADA"), therefore, Mr. Izzi is not be disabled. Sutton v. United Air Lines, 527 U.S. 471 (1999).

The three Rhode Island laws at issue here, however, differ from the ADA in this respect: they each examine the individual as he or she would be without the availability or use of "mitigating measures." For purposes of summary judgment, UPS agrees that Mr. Izzi's use of insulin is a "mitigating measure."

The burden of proving what Mr. Izzi's hypothetical condition would be absent his use of insulin, however, rests upon the plaintiff. Such an inquiry is a speculative, but necessary, endeavor. The only testimony by Mr. Izzi concerning what the effect of failing to take insulin would be was that "my sugar would rise" and that when that happens "They say you get weak." Izzi Depo. at 32. He further testified that his sugar has in fact risen to high levels, but that he had no symptom other than having to urinate.

Id. at 32-33. Moreover, Mr. Izzi is not himself an expert in medicine and is unqualified to testify directly as to what might or might not happen to him if he were to stop taking insulin. Mr. Izzi has revealed no expert witness, either in response to UPS' interrogatory seeking such identification or in conformity with Rule 26 of the Federal Rules of Civil Procedure, thus, there can be no admissible expert testimony to support what Mr. Izzi's hypothetical state might be if he were to go off insulin.

There is simply no competent testimony to support Mr. Izzi's claim that absent his taking insulin he would be substantially limited in any major life activity. Absent such testimony, Plaintiff will not be able to prove the essential element that he is disabled under the various Rhode Island statutes and UPS is entitled to summary judgment on all six remaining counts of the complaint.

B. The Disparate Treatment Claims Should be Dismissed

Even if Mr. Izzi had provided testimony that he would be substantially limited in a major life activity if one were to ignore his use of insulin, UPS is still entitled to summary judgment on Counts One through Three, which claim "disparate treatment" discrimination. The essence of a disparate treatment claim is that an employer has treated a protected employee differently than a similarly situated employee without the protected characteristic. See, e.g., Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003) (stating that disparate treatment results when "the employer simply treats some people less favorably than others because of their . . . protected characteristic.)." In this case, Mr. Izzi is being treated exactly like any UPS employee in Rhode Island with similar seniority but without a DOT Card. There is no similarly situated person without insulin dependent diabetes who is being treated differently by UPS than Mr. Izzi. Mr. Izzi is free to bid on an Air

Driver position but chooses not to. No person with similar or less seniority than Mr. Izzi is assigned to a fixed route that primarily uses a Smaller Vehicle. Finally, there is no evidence that any Cover Driver exclusively, or even primarily, operates a Smaller Vehicle as his or her job.

To the extent that Counts 1-3 assert discrimination claims separate and apart from a claim of failure to accommodate, there is absolutely no basis for such claims. To the extent Counts 1-3 are duplicative of the failure to accommodate claims of Counts 7-9, they still should be dismissed as explained below.

### C. The Failure to Accommodate Claims Should be Dismissed

Even if Mr. Izzi had provided testimony that he would be substantially limited in a major life activity if one were to ignore his use of insulin, UPS is still entitled to summary judgment on Counts Seven through Nine, which claim that UPS has failed to provide Mr. Izzi with a reasonable accommodation.

#### i. The RICRA Has No Reasonable Accommodation Requirement

As a preliminary matter, Count Eight should be dismissed because, in contrast to the RIFEPA and the RICRPDA, the RICRA contains no duty to accommodate persons with disabilities. Thus a claim of failure to accommodate a disability arises only under the Fair Employment Practices Act, asserted in Count VII, and the Rhode Island Civil Rights of People with Disabilities Act, asserted in Count IX. As explained below, under the undisputed facts of this case UPS has not violated those provisions.

#### ii. All the Failure to Accommodate Claims Fail

Whether the failure to accommodate claims of Count Eight survives the above analyses, that claims and the other failure to accommodate claims under Count Seven and Nine fail on their merits.

The Rhode Island statutes at issue largely track the federal Americans with Disabilities Act ("ADA") with regard to the reasonable accommodation requirement. The courts that have analyzed situations under the laws have generally tracked the case law developed under the ADA. Kriegel v. Rhode Island, 266 F. Supp. 2d 288, 296 (D.R.I. 2003); See Tardie v. Rehab. Hosp. of Rhode Island, 6 F. Supp. 2d 125, 132-33 (D.R.I. 1998) (if summary judgment is granted as to the ADA claim, it should also be granted as to FEPA . . . claim), *aff'd*, 168 F.3d 538 (1st Cir. 1999), (citing Hodgens v. Gen. Dynamics Corp., 963 F. Supp. 102, 104 (D.R.I. 1997). There are, however, potentially major distinctions between the ADA and the two Rhode Island laws that mention reasonable accommodation: Where the ADA speaks of a reasonable accommodation unless there is an "undue hardship", the Rhode Island FEPA speaks only of a "hardship" (leaving out the "undue" requirement) and the RICRPDA requires only accommodation "with no major cost". As noted above, the RICRA has no accommodation language at all in the statute.

Mr. Izzi seeks an accommodation to allow him to be a UPS Package Car driver. Given UPS' structure, there are only two possibilities: becoming a driver with a fixed route driver and becoming a Cover Driver. Neither solution is a reasonable accommodation under Rhode Island law. There are two legal propositions that need to be addressed in the abstract before turning the particulars of this case.

a. Seniority Systems and Reasonable Accommodation

As noted above, the Rhode Island statutes at issue are similar to the ADA in regards to reasonable accommodation. In 2002, the United States Supreme Court addressed the interaction between a seniority system and the ADA's "reasonable accommodation" requirement:

> The question in the present case focuses on the relationship between seniority systems and the plaintiff's need to show that an "accommodation" seems reasonable on its face, i.e. ordinarily or in the run of cases. We must assume that the plaintiff, an employee, is an "individual with a disability." He has requested assignment to a mailroom position as a "reasonable accommodation." We also assume that normally such a request would be reasonable within the meaning of the statute, were it not for one circumstance, namely, that the assignment would violate the rules of a seniority system. . . . Does that circumstance mean that the proposed accommodation is not a "reasonable" one?
>
> In our view, the answer to this question ordinarily is "yes." The statute does not require proof on a case by case basis that a seniority system should prevail. That is because it would not be reasonable in the run of cases that the assignment in question trump the rules of a seniority system. To the contrary, it will ordinarily be unreasonable for the assignment to prevail.

US Airways v. Barnett, 535 U.S. 391, 402-03 (2002). Similarly, violating a seniority system is not required under Rhode Island law.

b. National Labor Relations Act Preemption

The seniority system in this case, and many other relevant terms and conditions of employment, are governed by the Collective Bargaining Agreement. This case involves purely state law claims in the context of a collective bargaining agreement governed by the National Labor Relations Act ("NLRA"). This gives rise to issues involving potential preemption of the state law claims.

The First Circuit has stated that "[t]oday, labor-law preemption casts a relatively wide net." Flibotte v. Pennsylvania Truck Lines, 131 F.3d 21, 26 (1997). Federal labor

law "preempts a state law claim 'if resolution of [that] claim depends on the meaning of a collective bargaining agreement.'" Id. (citing Lingle v. Norge Div. of Magic Chef, 486 U.S. 399, 405-06 (1988)). A claim is preempted "when resolution of a state law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985). In this case, wages, hours and other terms and conditions of employment of employees at the UPS Warwick facility, including Mr. Izzi, are governed by a collective bargaining agreement between UPS and the Teamsters union. That Collective Bargaining Agreement governs, among other things, the rights of drivers to bid on and be assigned to certain routes.

In this case, the Court must analyze whether a proposed accommodation is "reasonable", whether the accommodation would produce a "hardship" and whether the accommodation could be done "at no major cost" to the employer. If resolution of any of these issues arising out of Mr. Izzi's purely state law claims requires interpretation of the Collective Bargaining Agreement, then those claims are necessarily preempted by federal labor law.

c. Fixed Route Assignment

To the extent that Mr. Izzi claims that UPS is obligated to assign him to a fixed route that exclusively uses a Smaller Vehicle, such a claim cannot go forward. While UPS believes that operating a larger vehicle is an essential function of any Package Car Driver position, it will assume solely for purposes of summary judgment that there are one or more fixed route positions out of the Warwick facility that primarily use a Smaller Vehicle. There is no evidence, however, that any fixed route that may primarily use a

Smaller Vehicle is filled by an employee with less seniority than Mr. Izzi. It is undisputed that fixed routes are assigned pursuant to a seniority system. Thus, putting Mr. Izzi into an existing fixed route that uses a Smaller Vehicle would violate the seniority system and not be a reasonable accommodation.

Nor would it be viable to create a new fixed route for Mr. Izzi or to reduce the number of packages on an existing route. Under the Collective Bargaining Agreement, if a route changes by more than 50% it becomes a new route subject to being re-bid under the seniority system. Deposition of Kevin Reddy ("Reddy Depo.") at 74-75. A new route that exists for 30 days becomes subject to bid. Reddy Depo. at 77. Thus, creating a Smaller Vehicle route for Mr. Izzi to use exclusively would violate the seniority system.

Providing Mr. Izzi with any of these accommodations would violate the seniority system, and thus would not be a "reasonable accommodation." Violating the seniority system would result in viable claims for breach of contract by the Teamsters that would be a "hardship" and could impose "major cost" on UPS. To the extent that Mr. Izzi claims that these accommodations would not violate the seniority system, such an analysis would necessarily entail interpretation of the collective bargaining agreement, and the state law claims would be pre-empted. Lingle v. Norge Div. Of Magic Chef, 486 U.S. 407 (1988).

d. The Cover Driver Position

The remaining alternative to allow Mr. Izzi to be a UPS Package Car Driver, therefore, is in the Cover Driver position. Mr. Izzi apparently contends that UPS could allow him to be a Cover Driver operating only vehicles 10,000 pounds and under.

However, an essential function of the Cover Driver position is the ability to operate any vehicle in the fleet, including the vast majority of vehicles that are over 10,000 pounds.

Cover Drivers handle a wide variety of routes, depending on which fixed route drivers are unavailable and where large volume is expected. The Cover Driver position exists to keep the UPS delivery system flexible and responsive to customer needs. No single Cover Driver regularly operates a Smaller Vehicle. Deposition of Mark Murphy April 26, 2005 ("Murphy Depo., Vol. II") at 94.

Mr. Izzi appears to be proposing that he be allowed to bid into a Cover Driver position and then be assigned only a small fraction of the work expected by the typical Cover Driver. In other words, Mr. Izzi proposes that UPS eliminate an essential function of the Cover Driver position, perhaps even the essential function of that position: the ability to flexibly cover whatever route is needed that day. The law does not require such a radical restructuring of the job.

This case is similar to Phelps v. Optima Health, Inc., 251 F.3d 21 (1st Cir. 1997). In that case the court considered, among other things, the argument a nurse made that the employer hospital could have placed her in a nursing position that only involved dispensing medications. The Court denied that creation of such a position was a reasonable accommodation. Just as some nurse somewhere in the facility was in all likelihood at every point in time dispensing medications did not mean that the facility needed to create a specialty job, so too does the (alleged) fact that at least one cover driver a day drives a Smaller Vehicle most days does not mean UPS has to create a "Smaller Vehicle Cover Driver" position.

In this case an essential function of the Cover Driver position is the ability to cover any route in the facility. Exempting Mr. Izzi from operating larger vehicles would exempt him from most of the job. Creating a new position is not a reasonable accommodation.

Moreover, creating a new position of "Smaller Vehicle Cover Driver" would create a new position subject to bid under the seniority system and that position could not be held exclusively for Mr. Izzi. Article 57, Section 2(B)(1) of the Collective Bargaining Agreement provides that "any new job in existence for more than thirty (30) days shall be considered a permanent job." Collective Bargaining Agreement, p. 167. Mark Murphy, UPS' Employee Relations Manager testified:

> A cover driver position does not just drive an under 10,000-pound vehicle. There is no such thing as an under 10,000-pound cover position. That would be creating a new job. If that new job was created, it lasts for 30 days, and it's biddable. So someone with more seniority, 30 days later, is going to go, I'll take that.

Deposition of Mark Murphy April 26, 2005 ("Murphy Depo., Vol. II") at 94. In addition, Kevin Reddy, Mr. Izzi's union Business Agent testified that "If they were to create a new job, it becomes, it becomes one of ours. You know what I mean? Someone would have the opportunity to bid on it." Reddy Depo. at 77. Violation of the seniority system is not a reasonable accommodation. <u>US Airways v. Barnett</u>, 535 U.S. at 402-03.

If Mr. Izzi argues, contrary to Mr. Murphy's testimony, that creating a new position of "Smaller Vehicle Cover Driver" would not create a new job subject to bid and thus violate the seniority system if retained exclusively for Mr. Izzi, then his state law claim will depend for its resolution upon an interpretation of the Collective Bargaining Agreement and is, therefore, preempted. <u>Lingle v. Norge Div. Of Magic Chef</u>, 486 U.S. 407 (1988).

UPS expects that Mr. Izzi will rely heavily upon the Ninth Circuit's 2001 decision in Morton v. United Parcel Service, 272 F.3d 1249 (9th Cir. 2001). In Morton, the plaintiff was unable to get a DOT Card because of a hearing problem. Therefore, like Mr. Izzi, she could not legally operate vehicles over 10,000 pounds. Ms. Morton claimed that UPS should have hired her as a Package Car Driver operating only vehicles under 10,001 pounds. The District Court granted UPS summary judgment, holding that Ms. Morton could not perform the essential functions of a Package Car Driver and that no reasonable accommodation was available. The Ninth Circuit reversed that decision. There are, however, substantial distinctions between this case and Morton.

Most importantly, unlike Mr. Izzi, Ms. Morton was "disabled" under the ADA and brought her claim solely under federal law as opposed to state law. As a result, the labor law preemption arguments described above were neither raised nor considered in that case. The Morton court was free to, and did, interpret the collective bargaining agreement at issue in that case quite extensively. Morton, 272 F.3d at 1253-54 & n.4. That exercise is prohibited in this case because these claims arise solely under state law.

Second, the assignment of drivers in Arizona in 1995 differed significantly from the assignment of drivers in Rhode Island since 2003. The Arizona operation did not have an annual bid for open positions but instead bids were held as positions became open during the year. That operation had no position of "Cover Driver," but instead drivers not assigned to a fixed route were "Swing Drivers" who, it seemed, could be assigned to specific groups of drivers. There was no discussion at all concerning the ability to bid on new positions, which in this case is contained in the New England

supplement to the Collective Bargaining Agreement and may have no counterpart to the relevant collective bargaining agreement at issue in 1995 in Arizona.

Finally, the court in Morton looked at the structure of the ADA and placed the burden of proof with regard to "undue hardship" on UPS and held that in the unique circumstances of that case, UPS had not met that burden. Morton, 272 F.3d at 156-57. In this case, the structure of the Rhode Island laws at issue here do not provide for a change to the traditional allocation of the burden of proof. Moreover, demonstrating "hardship" necessarily involves interpretation of the Collective Bargaining Agreement.

## Conclusion

For all the reasons set forth above, UPS is entitled to summary judgment on all remaining counts of the Complaint.

DEFENDANT - UNITED PARCEL
SERVICE INC.

By_______________________
Hugh F. Murray, III - BBO#645595
Laurie Alexander-Krom - BBO #637385

Murtha Cullina LLP
99 High Street
Boston, MA 02110-2320
Telephone: (617) 457-4000
Facsimile: (617) 482-3868
Its Attorneys

By Timothy M. Bliss
Lori C. Silveira (#3002)
Timothy Bliss (#6228)

Tillinghast Licht LLP
10 Weybosset Street
Providence, RI 02903
Telephone: (401) 456-1200
Facsimile: (401) 456-1210
Its Attorney

July 29, 2005

CERTIFICATE OF SERVICE

I certify that a copy of United Parcel Service's Memorandum in support of Defendant's Motion for Summary Judgment was mailed to plaintiff's counsel on the 29 day of July, 2005.

Carly Beauvais Iafrate, Esquire
170 Westminster Street
Suite 601
Providence, RI 02903

Laurie Alexander-Krom, Esquire
MURTHA CULLINA LLP
99 High Street
Boston, MA 02110-2320

Colleen M. Vardal

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANTHONY D. IZZI<br>Plaintiff | ) | |
| v. | ) | C.A. No: 04-321T |
| UNITED PARCEL SERVICE, INC.<br>Defendant | ) | July 29, 2005 |

RECEIVED
JUL 29 2005
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

**UNITED PARCEL SERVICE INC.'S RECORD MATERIALS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

The defendant, United Parcel Service Inc. ("UPS"), hereby provides record evidence listed below in support of its Motion for Summary Judgment. UPS has endeavored to comply with Amended General Order #2002-01 and limited the number of pages in this appendix to 20. Should the Court request additional material from the record, UPS will provide such materials.

1. Excerpts from Anthony D. Izzi Deposition Transcript dated February 2, 2005, attached as Tab A.

2. Excerpts from Kevin Reddy Deposition Transcript dated February 2, 2005, attached as Tab B.

3. Excerpts from Julie Ann Souza Deposition Transcript dated May 22, 2001, attached as Tab C.

4. Excerpts from Mark R. Murphy Deposition Transcript dated April 13, 2005 (Murphy I), attached as Tab D.

5. Excerpts from Mark R. Murphy Deposition Transcript dated April 26, 2005 (Murphy II), attached as Tab E.

6. Excerpts from Collective Bargaining Agreement, attached as Tab F.

7. Plaintiff's Responses to Defendant's Request for Admissions, attached as Tab G.

DEFENDANT - UNITED PARCEL SERVICE INC.

By ________________________
Hugh F. Murray, III - BBO#645595
Laurie Alexander-Krom - BBO #637386

Murtha Cullina LLP
99 High Street
Boston, MA 02110-2320
Telephone: (617) 457-4000
Facsimile: (617) 482-3868
Its Attorneys

By Timothy M. Bliss
Lori C. Silveira (#3002)
Timothy Bliss (#6228)

Tillinghast Licht LLP
10 Weybosset Street
Providence, RI 02903
Telephone: (401) 456-1200
Facsimile: (401) 456-1210
Its Attorney

July 29, 2005

CERTIFICATE OF SERVICE

I certify that a copy of United Parcel Service's Record Materials in Support of its Motion for Summary Judgment was mailed to plaintiff's counsel on the 29 day of July, 2005.

Carly Beauvais Iafrate, Esquire
170 Westminster Street
Suite 601
Providence, RI 02903

Laurie Alexander-Krom, Esquire
MURTHA CULLINA LLP
99 High Street
Boston, MA 02110-2320

Colleen M. Vandel

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RECEIVED
JUL 29 2005
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

ANTHONY D. IZZI
Plaintiff

v.

UNITED PARCEL SERVICE, INC.
Defendant

C.A. No: **04-321T**

July 29, 2005

**UNITED PARCEL SERVICE INC.'S RECORD MATERIALS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

The defendant, United Parcel Service Inc. ("UPS"), hereby provides record evidence listed below in support of its Motion for Summary Judgment. UPS has endeavored to comply with Amended General Order #2002-01 and limited the number of pages in this appendix to 20. Should the Court request additional material from the record, UPS will provide such materials.

1. Excerpts from Anthony D. Izzi Deposition Transcript dated February 2, 2005, attached as Tab A.

2. Excerpts from Kevin Reddy Deposition Transcript dated February 2, 2005, attached as Tab B.

3. Excerpts from Julie Ann Souza Deposition Transcript dated May 22, 2001, attached as Tab C.

4. Excerpts from Mark R. Murphy Deposition Transcript dated April 13, 2005 (Murphy I), attached as Tab D.

5. Excerpts from Mark R. Murphy Deposition Transcript dated April 26, 2005 (Murphy II), attached as Tab E.

6. Excerpts from Collective Bargaining Agreement, attached as Tab F.

7. Plaintiff's Responses to Defendant's Request for Admissions, attached as Tab G.

DEFENDANT - UNITED PARCEL SERVICE INC.

By [signature]
Hugh F. Murray, III - BBO#645595
Laurie Alexander-Krom - BBO #637386

Murtha Cullina LLP
99 High Street
Boston, MA 02110-2320
Telephone: (617) 457-4000
Facsimile: (617) 482-3868
Its Attorneys

By Timothy M. Bliss
Lori C. Silveira (#3002)
Timothy Bliss (#6228)

Tillinghast Licht LLP
10 Weybosset Street
Providence, RI 02903
Telephone: (401) 456-1200
Facsimile: (401) 456-1210
Its Attorney

July 29, 2005

CERTIFICATE OF SERVICE

I certify that a copy of United Parcel Service's Record Materials in Support of its Motion for Summary Judgment was mailed to plaintiff's counsel on the 21 day of July, 2005.

Carly Beauvais Iafrate, Esquire
170 Westminster Street
Suite 601
Providence, RI 02903

Laurie Alexander-Krom, Esquire
MURTHA CULLINA LLP
99 High Street
Boston, MA 02110-2320

Colleen M. Vandal

A. Providence/East Providence.
Q. And did you graduate high school?
A. Yes, sir.
Q. In what year?
A. '88.
Q. Did you go to any education beyond high school?
A. Yes. CCRI.
Q. CCRI?
A. Yes.
Q. Community College of Rhode Island?
A. Yes.
Q. Now, did you graduate from CCRI?
A. No.
Q. How long did you attend CCRI?
A. Two years.
Q. And did you get any certificate or anything?
A. No.
Q. And why did you leave CCRI?
A. I left CCRI for UPS.
Q. And before joining UPS, did you have any jobs?
A. Yes.
Q. And where did you work immediately before UPS?
A. Before UPS, that was awhile ago. I worked at Claflin Health Supply.
Q. And what did you do there?



A. Warehouse.
Q. Why did you leave there?
A. I just got a job with UPS.
Q. And what other jobs did you have before UPS?
A. I worked at Wendy's a long time ago. I worked at some gas stations.
Q. And before joining UPS, I take it you had no health issues related to diabetes?
A. No.
Q. When did you join UPS, what year?
A. 1989.
Q. And do you recall the month or the season, was it early or late?
A. October.
Q. And in what capacity did you join, what was your job?
A. Unloader.
Q. Was that a part-time position?
A. Part time.
Q. Was it at the -- which facility was it at?
A. I started in East Providence and then they closed that hub and we all moved to Warwick.
Q. When did they close the hub?
A. A year, year and a half into it.
Q. So, early 1990s?
A. Yes.



Q. What was your shift when you started at UPS?
A. I believe it was 5:30 start time at night.
Q. And how late did you work?
A. 8:30, 9:00.
Q. Did you have another job while you were a part-timer at UPS?
A. Yes, I had to have one, because it was only a part-time job.
MS. IAFRATE: If you can't remember.
A. Yes, I don't remember.
Q. When did you become a full-timer at UPS?
A. 1996.
Q. So, that would be seven years that you were a part-timer?
A. Yes.
Q. And in that time, did your job change or were you always a loader?
A. Unloader.
Q. Unloader?
A. Yes, always.
Q. Always an unloader?
A. I did drive Saturday air.
Q. Saturdays?
A. Yes.
Q. When did you start doing that?



A. Maybe three years into starting, maybe '91, '92.
Q. And can you tell us what the Saturday air job is?
A. Yes, you load your truck, the airs come down the belt, load the truck, and deliver the airs by noon.
Q. And where did you bring them to?
A. Wherever the -- somewhere in the State of Rhode Island.
Q. So, they're packages that came in by next day air?
A. By the airplane.
Q. By the airplane, and your job is to drop them off at various businesses or houses?
A. Exactly.
Q. And what kind of vehicle did you drive when you were an air driver?
A. All different types. Usually the smaller trucks, but I drove bigger trucks, too.
Q. Whatever was available?
A. Whatever was available.
Q. On Saturdays, were there usually a lot of trucks available?
A. Yes.
Q. Because most deliveries at UPS are not done on Saturday?

Page 14

went?
A. Yes.
Q. How long is the DOT card good for?
A. Two years.
Q. Did you get your card renewed each and every two years?
A. Yes.
Q. And while you were a Saturday air driver, but before you became a full-time package car driver, did each of those renewals, did you go to the doctor that UPS sent you to?
A. Yes.
MS. IAFRATE: Objection as to form.
Q. Do you understand the question?
A. Uh-huh.
Q. Is that a yes? You got to say yes.
A. Yes, sir.
Q. So, in 1996, do you recall what month in 1996 you became a package car driver?
A. I believe it was September.
Q. And were you assigned to a route?
A. No.
Q. What was your --
A. I was a cover.
Q. You were a cover. And can you tell us briefly what

Page 15

a cover driver is?
A. A guy who covers different routes if somebody is out or they put, I believe they put me on one route just to get my thirty days, and then I became a cover, which is a guy who floats around.
Q. And am I correct that there's an annual bid for routes every February or March?
A. Yes.
Q. And so in February or March of 1997, you bid on a route?
A. Yes.
Q. And did you get a route, or did you remain a cover driver?
A. I don't remember some time --
MS. IAFRATE: There's no question pending. Just wait.
Q. Is there anything that would help you remember what you bid on in 1997?
A. No.
Q. In 2002, the last time you were a package car driver for UPS, did you have a fixed route?
A. Yes.
Q. And what route did you have in 2002?
A. It was East Providence.
Q. And what about the year before, did you have a fixed

Page 16

route or were you a cover driver?
A. I believe I was a cover driver, but sometimes they would stick you on a route, and you would stay there for a while.
Q. Before you had the East Providence route, do you think that that year, the year before the East Providence route, that you were normally a cover driver, but you were on routes for a period of time?
MS. IAFRATE: Objection as to form.
Q. Do you understand my question?
A. Not really.
Q. At the bid in 2002, you bid onto the East Providence route, is that correct?
A. I'm not 100 percent sure, because like I said, sometimes you'd be a cover driver. I used to mix them up, so I don't know what year was what. Like, it's mixed up.
Q. The last time you were a package car driver, you stopped being a package car driver towards the ends of October 2002, is that correct?
A. Yes.
Q. At that time, did you have a fixed route or were you a cover driver?
MS. IAFRATE: Objection as to form.
Q. Can you tell me what the objection is?

Page 17

MS. IAFRATE: "Fixed." I don't know what you mean by fixed. Assuming he understands.
Q. Do you understand what I mean when I say a fixed route?
A. Yes.
MR. MURRAY: So, you understand that.
MS. IAFRATE: Can you explain to me. I don't know if his understanding is the same as yours.
Q. Why don't you explain to me what you mean by a fixed route?
THE WITNESS: Do you mean a bid route is a fixed route?
MR. MURRAY: Yes.
A. Okay.
Q. I'm distinguishing between a cover driver and driver with a bid route; does that make sense?
A. Yes.
Q. Did you have a bid route before you stopped being a package car driver in 2002?
A. I honestly don't remember, because they would -- sometimes I would bid a route and get it; sometimes I would bid cover, and they would let me be cover, and sometimes I'd be cover, and they would stick me on a route for six months to eight months.

Page 22

from drivers, is that correct?
A. Yes.
Q. And tell me if I'm wrong, but it's important for you to get back to the facility on time so that your -- the packages you picked up can get into the system to be moved across the country overnight, is that correct?
A. Yes.
Q. So, if you take too long, you slow the process up?
A. Yes.
Q. Now, you had to get a DOT card every two years, is that correct?
A. Yes.
Q. And before you found out you were diabetic or before you became diabetic, did the doctors ever ask you about any diabetes while you were in your DOT physical?
A. No.
Q. And before you became diabetic, did you ever go to your own personal physician for your DOT card?
MS. IAFRATE: Objection as to form.
Q. Do you understand the question?
A. Repeat it.
Q. Let me back up. When did you first find out you were diabetic?

Page 23

A. I believe it was 2002. I can't remember.
MR. MURRAY: Can we mark this as Exhibit 1.
(DEFENDANT'S EXHIBIT 1 MARKED FOR I.D.)
Q. I'm giving you what's been marked as Exhibit 1; could you read the date on that and then the rest of this, and I'll ask you a question.
(WITNESS PERUSES DOCUMENT)
Q. Have you read that document?
A. Yes.
Q. Does that refresh your recollection as to when you first were treated for diabetes?
A. Yes.
Q. And so when were you first treated for diabetes?
A. That date, June 28, 2000.
Q. June of 2000, is that correct?
A. I don't remember, but --
Q. Do you recall a meeting with Karen A. Gladney, the person who signed this letter?
A. No.
Q. Do you recall a meeting?
A. I don't know who she is.
Q. Do you recall a meeting with anyone about diabetes education?
A. Yes.

Page 24

Q. And was it with a woman?
A. Yes.
Q. And do you recall the woman telling you things such as those that are set forth in this letter?
A. Yes.
Q. And you went to that woman, I assume, because you had been to a doctor who suggested that, is that correct?
A. Yes.
Q. So, would it be fair to say that you were diagnosed with diabetes sometime prior to June 28, 2000?
A. At that time, yes.
Q. Maybe a day or two before or a week or two before, is that fair to say?
A. Yes.
Q. Now, before you were diagnosed with diabetes, did you ever get your DOT card from any physician who was your normal regular treating physician?
A. No.
Q. Can you tell me how you first discovered that you were diabetic?
A. I was thirsty.
Q. Unusually thirsty?
A. Yes.
Q. And when is the first time a physician indicated to

Page 25

you that you were diabetic?
A. I guess around that time.
Q. Did you go to an emergency room at all in 2000?
A. Yes.
Q. Because of a diabetic incident?
A. No, I didn't know what it was. I thought --
Q. What symptoms caused you to go to the emergency room?
A. I was drinking a lot.
Q. A lot of water?
A. Yes.
Q. And you were diagnosed as diabetic at that time?
A. Yes.
Q. And were you put on insulin at that time?
A. No.
Q. When did you get put on insulin?
A. I would say awhile, maybe ten months later. I can't remember.
MR. MURRAY: Could you mark this as Exhibit 2.
(DEFENDANT'S EXHIBIT 2 MARKED FOR I.D.)
Q. I'm going to show you what's been marked as Exhibit 2, it's a two-page document; do you recognize that document?
A. The second one I recognize.

Page 26

Q. The second page; and what is the second page?
A. The DOT card.
Q. From what date?
A. 10/3/02.
Q. The first page, do you recognize what that is?
A. I don't know who that Elaine, I don't know who that is, no.
Q. The first page is dated about two years prior to October 3, '02; did you go for a DOT card in October -- strike that. I was off on my dates. We'll get back to this. So, you were diagnosed with diabetes in the summer of 2000; did you get a DOT card in the fall of 2000?
A. Yes, in the fall of 2000, yes.
Q. Did anyone ask you at that examination whether you were diabetic?
A. No.
Q. Did you tell the physician at that examination that you had been recently diagnosed as diabetic?
A. No.
Q. Now, when did you discover that you were -- when did you have to start taking insulin?
A. Ten months after, roughly, say ten months after the DOT card.
(DEFENDANT'S EXHIBIT 3 MARKED FOR I.D.)

Page 27

Q. Could you read Exhibit 3 to yourself and then let me know when you're done.
(WITNESS PERUSES DOCUMENT)
Q. Are you finished?
A. Yes.
Q. Does this refresh your recollection as to when you became, you started being treated with insulin?
A. Yes, it was after this date, I believe.
Q. And that date is January 22, 2001?
A. Yes.
Q. And who is Dr. Cazzaniga?
A. He was an M.D., a regular M.D.
Q. Is he your normal physician?
A. Yes.
Q. He was at the time?
A. Just normal physician.
Q. And who is Dr. Laufgraben?
A. He was the first diabetes doctor I had.
Q. And why did Dr. Cazzaniga send you to Dr. Laufgraben?
A. Because he was a specialist.
Q. Were you exhibiting some symptoms you were concerned about?
A. Just, the pills stopped working.
Q. And when they stopped working, how did that show

Page 28

itself to you, did you have blurry vision or were you getting tired or losing weight?
A. Just, I lost weight.
Q. From the time you were diagnosed with diabetes until you saw Dr. Laufgraben, did you suffer from blurred vision related to your diabetes at all?
A. No.
Q. Did you tell anyone you ever suffered from blurry vision at that time?
A. No.
MR. MURRAY: Can you mark this as Exhibit 4.
(DEFENDANT'S EXHIBIT 4 MARKED FOR I.D.)
Q. Exhibit 4 is a document that I believe we got from your attorney in the discovery process; there is a chart dated July 10, 2000, and it describes a 30-year-old male here with blurred vision and itchy rash; does that refresh your recollection as to whether you ever had blurred vision?
A. No.
Q. It doesn't help. Did you go see Dr. Stunk in the summer of 2000, to the best of your recollection?
A. Doctor who?
Q. I'm looking at the bottom, says University Medicine Foundation, Edward J. Stunk, I believe, or Stefano

Page 29

Cazzaniga?
A. Cazzaniga, yes.
Q. Did you visit him in the summer of 2000?
A. I don't recall. Yes, I remember visiting him. I don't know when it was.
Q. Did he tell you that your diabetes was causing blurry vision?
A. No, he wasn't exactly sure what it was.
Q. But you did have blurry vision?
A. I don't recall.
Q. You don't recall. And this doesn't help you remember?
A. No. No. That was awhile ago. I don't remember.
Q. So, at some point in early 2001, you went to see Dr. Laufgraben, in part, because you were losing weight, is that correct?
A. Yes.
Q. And how much weight did you lose?
A. Around 50 pounds.
Q. And how much do you weigh today?
A. Two hundred.
Q. And at the time you went to see Dr. Laufgraben, how much did you weigh?
A. I don't know, maybe 150.



www.AlliedCourtReporters.com ALLIED COURT REPORTERS, INC. (401)946-5500 or (888) 443-3767
84aa1fca-bd98-4304-b670-3cfd57a3cf5c

Q. So, you're now at your normal weight?
A. No, I'm a little over.
Q. A little over. So, in the winter of January of 2001, you were significantly lighter than you are now?
A. Yes.
Q. And Dr. Laufgraben put you on insulin, is that correct?
A. Not at first. After.
Q. After what?
A. A little while after, he, you know, I believe I was still on the pill with him.
Q. And --
A. Soon after.
Q. So, approximately what date, if the letter that's Exhibit 3 is January 22, 2001, would it have been maybe in February of 2001?
A. I don't remember. It was after.
Q. Was it a week, a month, a year after?
A. I don't remember.
Q. Well, do you remember whether it was a year?
A. No, it was within that year.
Q. It was less than a year?
A. Yes.
Q. Was it six months or less?



A. Maybe. I don't remember.
Q. I'm just trying --
A. Yes.
Q. I'm just trying to narrow this down here. So, you don't know whether it was February or June of 2001 that you started the insulin?
A. No.
Q. That's correct?
A. Yes, I think it was ten months after I maybe went on the pill, I believe.
Q. So, if you went on the pill in June of 2000, then ten months would be, say, April of 2001; is that about right?
A. I believe. I'm not positive.
Q. And has your insulin regimen changed from the time you first went on it to today?
A. One time a little bit.
Q. Can you tell me what the insulin regimen was like when you first started it, how often did you have to --
A. The same amount of times.
Q. And it's an injection, is that right?
A. Yes.
Q. How often do you inject the insulin?
A. Two times a day.



Q. And --
A. Some, yes.
Q. And do you have an understanding of what could happen if you stopped doing that?
A. Yes.
Q. Can you explain your understanding of that to me?
A. My sugar would rise.
Q. And do you have an understanding of what effect your sugar rising has on you?
A. They say you get weak.
Q. Have you ever experienced your sugar rising and you getting weak?
A. No.
Q. You test your blood sugar regularly?
A. Yes.
Q. And you have tested your blood sugar regularly since first becoming diagnosed with diabetes?
A. I don't think -- I can't remember.
Q. How do you test it, with a finger stick?
A. Yes.
Q. And a little device that tells you --
A. Hum-hum, yes.
Q. And what's a high sugar count?
A. Anything over, I think 130, they say is high.
Q. And what's the highest sugar count that you can



recall testing yourself at?
A. Well, there's all different types, in other words, if you're like at a thousand, then that's very dangerous, if it's 300, 250, that's high, but it's not life threatening.
Q. Sure. And what's the highest you recall testing yourself at?
A. 300.
Q. And could you tell because of the way your body was feeling that your sugar was high at that time?
A. No. It all depends. Sometimes.
Q. So, there have been occasions when you could tell that your sugar was high without doing the test, is that right?
A. If I had to urinate. That's it.
Q. Any other symptom besides having to urinate?
A. No.
Q. Now, when you spoke with Dr. Cazzaniga, did he ever discuss with you potential dangers associated with driving while you were diabetic?
A. No.
Q. When you spoke with Dr. Laufgraben, did he ever discuss driving and dangers because of the diabetic condition?
A. No. Well, you can --

Page 46

A. Yes.
Q. And volume at UPS goes down significantly comparing the first week of January to, say, the third week of December, is that accurate?
A. It used to be. Not as much anymore.
Q. But in 2002 to 2003, that time frame we're talking about, was there significantly less volume in January 2003 than there was in December 2002?
A. I don't know, because I didn't drive.
Q. In January?
A. Yes.
Q. Right. Okay. So, then you went inside; well, let me ask you if you went to -- do you recall the date you went for your second DOT card, physical?
A. Of what year?
Q. Of 2002, I'm sorry, this time when the doctor said you couldn't get it?
A. I went when they told me to go, whenever it was, UPS.
MR. MURRAY: Could you mark that Exhibit 6.
(DEFENDANT'S EXHIBIT 6 MARKED FOR I.D.)
Q. Exhibit 6 is a letter from Kent Occupational Health in Warwick, Rhode Island, stating, "Anthony Izzi was in our office on October 29 for his DOT physical."

Page 47

Does that refresh your recollection as to when you went for your DOT physical in Warwick?
A. Yes.
Q. So, it was the end of October, is that right?
A. Yes.
Q. And you testified for two weeks after that a supervisor rode with you, is that right?
A. Roughly.
Q. So, that would bring us to the middle of November, right?
A. Yes.
Q. And then you testified around then, you testified around Christmas you were driving a smaller vehicle?
A. Before Christmas.
Q. Did you go straight from the supervisor driving the vehicle to you driving a smaller vehicle or was there a period when you were inside?
A. I don't recall. Might have been. I don't recall.
Q. You don't remember?
A. No.
Q. So, now January 2003, you're back inside, is that right?
A. Yes.
Q. And that's the shift, eleven p.m. to eight a.m.?

Page 48

A. Yes.
Q. And has that changed at all for you since then?
A. No.
Q. You're still doing the same workday?
A. No, I do other work now, because they didn't let me bid the first year -- I bid a job the first year, but they never moved me to it, they kept me doing that almost a year into the job.
Q. So, the 2003 bid is March of 2003 or February, I always forget, is it February or March?
A. It varies.
Q. But the 2003 bid in the first quarter of 2003, did you bid on something?
A. Yes.
Q. And what did you bid on?
A. Cover route and inside job.
Q. So, the cover route, did you get the cover route?
A. No.
Q. Did you have the seniority to get the cover route?
A. Well, they said no, but -- no, they said no, but I've seen guys in smaller trucks driving.
Q. My question is not about the smaller vehicles, my question is about your seniority and the route for which you bid in 2003; you said you bid for a cover driver route, is that correct?

Page 49

A. Yes, I believe it was a cover driver route.
Q. And setting aside the lack of a DOT card, did you, to the best of your recollection at that time, have the seniority to get a cover driver position?
A. It all depends. Yes and no, because they didn't give it to me, but yes, because some guys that were driving I had more seniority that were driving cover routes.
Q. So, there were some people driving cover routes that had less seniority than you?
A. Yes.
(OFF THE RECORD)
Q. Now, in the first two or three months of 2003, were you aware of any drivers who drove a smaller vehicle nearly everyday?
A. Not the same person, but there were people with less seniority than me that drove smaller vehicles.
Q. My question is narrower than that. Were you aware of any drivers in the Warwick facility who, everyday, drove a smaller vehicle?
THE WITNESS: One specific one everyday?
Q. So that person "X," one specific individual had a smaller vehicle Monday, Tuesday, Wednesday, Thursday, Friday, every week?
A. The same person.

Page 74

A. Yes.
Q. Is that air route, you said, is that deliveries to office buildings or buildings, or is it deliveries to airports?
A. He does a little bit of both. He makes a pickup. He'll run some stuff off, then he runs from here to Logan. Very seldom he runs to Bradley. Mostly everything out of air runs to Logan.
Q. Most of his packages are small?
A. Yes, envelopes, majority being envelopes.
Q. Now, you said that if a route changes by more than 50 percent it becomes a new route or you can bid?
A. The driver can bid off of his route if it changes more than 50 percent. He has a right to bid on a route, on a route that anybody junior from him has. He can bump him out of it.
Q. How do you define that, changing a route; can you give me an example, concrete example, so I can figure out what that means?
A. I don't know how to explain it. You know what I mean? If I had Jefferson Boulevard and, I don't know, Post Road and all of a sudden I had Post Road and Warwick Avenue and the Jefferson Boulevard part was gone, that was 50 percent of my run. I could then bump the guy who has the Jefferson Boulevard now,

Page 75

if that's what I wanted, if he was junior to me. They have what they call an A-B-C bid. He would bump somebody. Then the next, that guy would have one bump and then one more person would have a bump. Everybody else would have to stay where they were.
Q. So if a route were changed to be lessened, so that it wasn't as hard, didn't have as many stops --
A. Sure.
Q. -- and that change got up to 50 percent, so it was 50 percent of the route or 49 percent of the route, the driver, would the driver have a right to stay on the route?
A. Absolutely. He can grieve -- sorry, I'm interrupting.
MR. GURSKY: If you wait for a second, let him go to the next question.
Q. If the driver wanted to stay on that reduced route, he could; is that correct?
A. Absolutely.
Q. Could anyone bid on his new route before the next bid?
A. No.
Q. But when the next bid came around --
A. He could stay on it.
Q. Unless someone else bid for his route, correct?

Page 76

A. Yes, unless someone senior bid.
Q. So if a route was reduced and then come around March a more senior person might bid on that; is that accurate?
A. Yes.
Q. Is it fair to say that the people with the higher seniority try to bid on routes that they perceive to be easier?
A. Sure.
Q. That's human nature, right?
A. Yes.
Q. Do you know Mr. Coogan or Ms. Coogan? I don't know whether it's male or female.
A. Yes.
Q. Is it Mr.?
A. Yes.
Q. Do you know what his route is?
A. No. I'd be lying to say.
Q. What about Mr. Chin?
A. Yes, I know Mr. Chin.
Q. Do you know his what his route is?
A. I'm not sure whether that's Eddy or Jimmy. Is it Jimmy? It must be Jimmy.
Q. It's a J.
A. I'm trying to think of where Jimmy runs. I'm

Page 77

not sure. I would be lying to say. I'm not sure. There are 300 routes. For me to know all of them would be really something.
Q. The top one, Brigida?
A. Yes, Michael, he's somewhere out north, Foster, Scituate. I'm almost positive somewhere out there, because that's where he lives.
Q. Now, you never were employed by UPS; is that correct?
A. No.
Q. You were never a package car driver?
A. Never.
Q. Could you turn to Page 167 in the Collective Bargaining Agreement? Look at the bottom, Section 2B1. There's a sentence that says, "Any new job in existence for more than 30 days shall be considered a permanent job." What does that mean?
A. If they were to create a new job, it becomes, it becomes one of ours. You know what I mean? Someone would have the opportunity to bid on it.
Q. Changing a route is not creating a new job?
A. No.
Q. What's the rate of an air driver compared to the rate of a package car driver?
A. I don't know exactly. It's in Article 40.

Q. Even if they weren't covered, they weren't disabled for purposes of ADA?
A. If they requested to drive a lower weight vehicle, we'd put them through it.
Q. So on June 11 is when Regina Hartley and Gina Bridges decided he wasn't covered?
A. That was June 11, yes.
(PLAINTIFF'S EXHIBIT 8 MARKED FOR I.D.)
Q. I'll show you the next one, which is 8, and it looks like I have one copy of 8; do you recognize that as being the diabetes protocol or part of the diabetes protocol?
A. Yeah.
Q. On the upper right-hand corner there is a notation from you?
A. Yes.
Q. And it looks like you sent it to him on June 27?
A. Yes.
Q. When did you first find out that there was such a thing as the diabetes protocol?
A. I don't know the first date I found out about it.
Q. Did you know about it when you first started putting Anthony through the ADA protocol?
A. I don't remember.



Q. Had you ever used it for any other driver before Anthony Izzi?
A. No.
Q. Was he the first person that you ever used it for?
A. Yes.
Q. And so the time when you learned about it was in the context of the Anthony Izzi situation?
MS. ALEXANDER-KROM: Objection.
MS. IAFRATE: Is that true?
A. Well, I don't know if that's the first time I knew about it. I don't remember the first time.
Q. So you may have known that it existed before Anthony Izzi?
A. I don't remember the date, so...
Q. Do you remember who told you about the diabetes protocol?
A. I don't remember.
Q. Okay. So you may have known about it before Anthony Izzi?
A. Yeah.
MS. IAFRATE: Hold on one second.
(ATTORNEY REVIEWS DOCUMENT)
Q. So, was it your understanding that prior to Anthony Izzi's case, somebody with diabetes could fail the DOT physical but still be allowed to



drive under certain circumstances?
THE WITNESS: If they failed the DOT physical?
MS. IAFRATE: Yes. Could not get a DOT card.
A. Yeah. Then they would not be allowed to drive unless they qualified under the protocol.
Q. And you feel that you had that knowledge before Anthony Izzi?
MS. ALEXANDER-KROM: Objection.
Q. Or do you feel, I'm sorry, do you feel you had that knowledge before Anthony Izzi?
MS. ALEXANDER-KROM: Asked and answered. She said she doesn't remember when she first learned of the knowledge -- let me rephrase that. Objection. She already testified she does not recall when she first learned of the diabetes protocol. She answered that a couple of times now.
MS. IAFRATE: I might ask it again, then.
MS. ALEXANDER-KROM: And I'll object.
A. I don't remember.
Q. So you don't remember who told you about the diabetes protocol?
A. I don't.



Q. Have you put anybody else through the diabetes protocol since Anthony Izzi?
A. No.
Q. And did Anthony Izzi pass the diabetes protocol that you remember?
A. Yes.
Q. Is the diabetes protocol limited in any way to certain types of drivers that you know of?
A. Certain types of drivers? I don't believe so.
Q. So as far as you know, could any package car driver be put through the diabetes protocol?
A. Well, I don't think they'd be a package car driver if we were putting them through, because they'd have to be on insulin, so --
Q. So what kind of driver would they be, then?
A. Well, they, in order to get -- if they were initially a driver but disqualified from DOT, we can put them through.
Q. And then would they still be a package car driver after?
THE WITNESS: If they did not pass the protocol?
MS. IAFRATE: No. If they passed it.
A. If they passed the protocol, they could drive

Q. But if you have the need to do it, if you're looking for guys, you may do that?
A. Well, keep in mind, that if we're looking for guys, then what they're doing currently, they come off doing, and we have to replace them. So either way there is a hirer situation. We'll do it strategically to try and get people -- we want people once they become service providers from their part-time transition to be as successful as possible. So we'll sometimes allow them, if they have the flexibility in their life, to go out and work full time for the peak season versus part time and gain that experience that they're going to need later on.
Q. So do all full-time people have to first be part-time?
A. No.
Q. So you could hire somebody off the street as a full-time package car driver?
A. There are contractual restrictions to that but yes.
Q. So is there a certain number? When you say a contractual restriction, that you can -- you're allowed to hire a certain number of full-time package car drivers off the street, and then you



have to take a certain number from the part-time people?
A. Actually, it's verbalized differently. We have to make six of our part-time loader or unloader, part-time employees, full-time drivers for every one person that we can hire from the street.
Q. So is there a certain sort of protocol or policy that you have to follow when you're in the peak season and you're trying to determine who these extra drivers are going to be?
A. I need more clarification. When you're talking about the extra drivers, are you talking about the ones we hiring from the street or the ones that are coming from the inside?
Q. Either way. Other than that contractual provision that you just talked of that you have to do in a six to one, does that apply during peak?
A. Six to one does not apply during peak.
Q. So that's not on the table for peak season?
A. We have an open ability -- a contractual agreement, from October 1st to December 31st I can hire as many people as I want, and they can come from anywhere I want them to come from.
Q. And the people that you might hire, you may hire them just for that period of time; is that the



idea?
A. That's correct.
Q. Because then after December 31st you wouldn't have anything to do with them?
A. Right.
Q. But you're not limited in any way in who you use, either from the outside or from the inside?
THE WITNESS: Limited by whom?
MS. IAFRATE: Anybody.
A. Well --
Q. Does the manager have the ability to just say --
A. No. Because, again, it's going to play into i.e., HR, for example, the manager could have ten people on a preload shift that he says good workers, I would like to have them for my peak season. The problem is the preload manager is going to go, hey, wait a minute, you take my ten best people, and I'm going to hire people off the street, we're going to sink. So there's a lot more evolution of authority that happens before that can happen.
Q. But for the most part it's based on whether it's reasonable or not?
A. Exactly.
Q. And then there's the air drivers, which we haven't



really talked about to this point as to what they do, but there's air drivers that deliver air packages?
A. That's correct.
Q. And are all air drivers part-time air drivers?
A. They're either part-time air drivers or it's part of a combo job.
Q. And when you say combo job, we mean the 22.3 combo?
A. That's correct.
Q. Where it's a part-time air component and then a part-time inside job?
A. That's correct.
Q. And could you use an air driver in a full-time capacity during the peak season? Same way you would use any inside worker, where you would take them off of their --
A. No.
Q. -- inside portion of their job?
A. No. They would have to be a qualified service provider. There are different qualifications, training qualifications and so forth for our drivers versus -- as I mentioned earlier, I can be an air driver for five, ten years. Now I'm going to become a service provider. I'm going to have

to be trained in certainly elements that don't fall into the need for knowledge that an air driver would have. International packages, you know, ground packages that an air driver wouldn't see on a regular basis, different type of services that aren't offered through the air system.
Q. Have you ever had, speaking of sort of peak, have you ever had a situation throughout your whole time at UPS where there wasn't enough work to keep everyone busy and actually lay people off?
THE WITNESS: At peak?
MS. IAFRATE: No, any time.
A. Very, very rarely. Very rarely.
Q. In the last five years?
A. Again, it would be periodic. It would be periodic and sporadic -- not sporadic. Periodic and sporadic is the same thing. And varied in location. I mean, as a company, no.
Q. And in Warwick, do you have any personal knowledge of any layoffs in the last five years?
A. I do not.
MS. IAFRATE: Why don't we break for lunch now.
(LUNCH RECESS FROM 1:25 TO 2:00 P.M.)
Q. Let's talk a little bit more about the driving



position. For the most part when do package car drivers start work during the day?
A. Generally between eight and nine in the morning.
Q. But they have all different start types?
A. Yes, they do.
Q. So there are some package car drivers that could start as late as 10?
A. Generally, no. The air commitment is 10:30, so most package car drivers have some air on their route, or at least the potential of having air on their route, so we try to get them started by 8:45 probably. If there's a 9:00 start, it's the rarity. By 8 to 8:45, and generally it's more like 8:30 to 8:45.
Q. How long is their typical day?
A. Average for this district has been running about 9.4 hours.
Q. Which is on the high end?
A. No, it's about average. They will work generally no less than eight, and we try and keep them -- we have an effort to try and keep them under 9.5 work hours, but to average out to 9.5, you've got some people working over 10 and 11.
Q. So that time includes that's just when they leave



the building -- when they get there, they leave the building, go deliver packages, and by the time they come back, you're saying that --
A. No, that's work time. There's an hour lunch in between. So they're actually working anywhere from 10 to 12 hours a day.
Q. So do most package car drivers stop and take an hour for lunch or no?
A. Yes.
Q. They really do or they're supposed to?
A. They're contractually entitled to it. If they don't, thank you very much, I appreciate it.
Q. I've never seen a package car eat lunch, but hey.
A. A lot of times they eat up their lunch by having intermittent conversations that aren't planned.
Q. Like when I see the three trucks all gathered at the same spot?
A. Exactly.
Q. So there are probably times then where the average day or you're saying the average is 9.4, so there could be people working as many as 10 hours in a day or something like that?
A. Absolutely.
Q. And there is no limit by contract or anything as



to how many hours they can work? They get paid overtime for anything over what?
A. Over eight.
Q. But they can't just, you know, when the eight hours end, they just can't say I'm done for the day?
A. Not if they want to come back tomorrow.
Q. Right, so it's not a voluntary overtime situation?
A. No.
Q. Do they have to be back to the building by a certain time to sort of get their packages into the system by a certain time?
A. The air packages need to be back earlier, and for that reason we will use air drivers to actually sometimes go and pick up packages from regular drivers or have the drivers drop them in like a letter box that's outside, put air packages that might containerize in those. Have an air driver go by and pick them up, so the driver can remain out. There are some limitations on whether or not they get back to the building in time to have that hub cycle work, but the hub circle works until 10 or 11:00.
Q. But the air packages have to be sort of out of the division by what time?

Page 146

next time that person is out, you can't stand in front of me and say I don't know anything.
Q. Has it ever been done where the supervisor does not go out though and the person goes out, and say the supervisor says maybe I'll meet you later or something like that?
A. Sure. Again, depending on that person's skill set.
Q. And I know I couldn't pin you down on what number of cover driver routes is a good number, but if somebody knew 12 routes, would that guy be an okay guy?
A. Yeah, probably. If within a center -- it depends on how big the center is. If I've got a center of 30 routes and they knew 12, and if they've proven that they can learn the 12, then if I need to teach them a 13th and a 14th and a 15th, as time goes on I might be able to do that. Am I going to commit to them that those are the only 12 they're ever going to have to do? Not in this lifetime.
Q. No, but if the person had 12, would you say that gives you some flexibility with where you can put that guy?
A. Yes. I mean, it gives me 12 routes of

Page 147

flexibility, and generally I'm going to be able to work something out, but it's an abstract number.
Q. Right. So there's no formula for cover drivers like -- it's not like if I'm cover driver Joe, I cover for these 10 people and that's it?
A. No.
Q. Or one cover driver per every three fixed routes?
A. No. A cover driver is a position that gives us tremendous operating flexibility, and we will kind of fight to the death to not limit that at all.
Q. So do cover drivers ever cover for an air driver?
A. Generally, no. In an emergency situation, for example, if the stars aligned and I've got a cover driver I've got no work for and an air driver calls in sick, I might say, okay, you know what, that half day we talked about, you're going to do this air run while I try and figure out what you're going to do for the rest of the half day so that my boss doesn't fire me for having a bad plan. Because I do not want to explain to my boss why I had a full-time driver at $25 an hour that I had no work for.
Q. Right, so I think we said this before but let me just make sure, so a cover driver could be driving an under 10,000-pound vehicle, or it could be

Page 148

driving an over 10,000 pound vehicle; it just depends on what route they're covering?
A. Yes.
Q. And if there are 108 cover drivers covering 108 routes or doing 108 jobs on any particular day, do you think it's possible that at least one of those 108 cover drivers could be driving an under 10,000-pound package car every day? How about that for a question?
MS. ALEXANDER-KROM: I'm going to actually object here.
MS. IAFRATE: I'm sure you are. I'd object to it.
Q. But you do have it in your mind, or do I need to try it again?
MS. ALEXANDER-KROM: Well, I think you're saying two different things. Listen to the question.
A. Try and rephrase it.
Q. I don't know if I can rephrase it. I can ask it slower. If you have 108 cover drivers, and so they all come in and they are going to cover for 108 either vacation --
A. First of all, 108 cover drivers are divided by four routes. I don't have 108 -- I don't have

Page 149

that broad spectrum.
Q. Okay, so say it's --
A. It's not within that broad spectrum. Say, for example, I have 30 routes in a building or in a center or 40 routes in a center, and if you're saying there's four centers and 108, and I've got 25 cover drivers, which that's a number that's staggering to me.
Q. Whatever number I use.
MS. ALEXANDER-KROM: It's all hypothetical.
Q. Right, it's all hypothetical, so even if we say 50, if you've got 50 cover drivers, and there's 50 routes that need to be covered?
A. Right.
Q. Is it possible that on any given day there could be at least one of the 50 driving an under 10,000 pound package car?
A. It depends on what's in the building. I have some facilities that don't have a single under 10,000 pound vehicle.
Q. So let's try to make it a little more realistic. In Warwick.
A. In Warwick.
Q. Right, so in Warwick there are under 10,000-pound

Q. I'm not speaking about breaking the contractual agreement, I'm talking about if the judge ordered you to put Anthony in an under 10,000-pound vehicle every day as a cover driver?

A. That would be breaking the contractual agreement.

Q. How about if he had enough seniority to bid a cover driver position?

A. A cover driver position does not just drive an under 10,000-pound vehicle. There is no such thing as an under 10,000-pound cover position. That would be creating a new job. If that new job was created, it lasts for 30 days, and it's biddable. So someone with more seniority, 30 days later, is going to go, I'll take that.

Q. You're saying it would be a new job. What I don't understand is if there is a cover driver today in Warwick that they put on in an under 10,000-pound vehicle today, and then tomorrow there's another cover driver and they put him on an under 10,000-pound vehicle. Instead of putting that cover driver on the under 10,000-pound vehicle, they put Anthony on it, how is that creating a new job? If they're just

(c) Preference shall be given to employees older in service and in order of their seniority to the work available, provided that such employees are available at such time as the work is assigned and are qualified to perform the work required.

(d) All time spent in Company orientation programs will not count toward the acquisition of seniority. People attending orientations shall be paid a daily rate of one hundred dollars ($100.00) for full time and thirty dollars ($30.00) for part time. Part-timers going to full time orientation will be paid at their current part time rate or whichever is greater.

## Section 2 – Bidding

(A) Annual Bid

(1) In each location a schedule of all starting times in each classification shall be posted for bid on the second Monday in February each year and shall remain posted for (2) weeks.

Package (Metro) driver starting times shall also include the general area of the route and feeder driver starting times shall also indicate if the assignment is over or under 140 miles.

(2) Full time seniority employees, in the order of their seniority and provided they are qualified for the job selected, shall have the right to select starting times in any classification (except Lead Drivers) from the schedule posted. Except as provided herein such selection shall be held until the next annual bid.

(B) Higher Rated Jobs – Inside to Outside

(1) During the year between the posting of the schedule, full-time seniority employees, in the order of their seniority and provided they are qualified for the job selected, shall have the right to select a starting time in a classification with a higher hourly rate when a new permanent job opening or vacancy exists in such classification. Any new job in existence for more than thirty (30) days shall be considered a permanent job. Temporary jobs added from October 1 to December 31 shall not be subject to bid.



(2) During the year between the posting of the schedule, full time inside seniority employees, in the order of their seniority and provided they are qualified for the job opening, shall have the right to select a starting time in an outside classification. In such cases, the outside classification shall be held until the next annual bid unless a new permanent job opening or vacancy exists in an outside classification with a higher hourly rate in which event the employees shall have the right to select such openings or vacancies.

(C) Phase-In Procedure

The Company agrees to phase in the changes expeditiously which may result from (a) (1) and (2) above in such a manner as not to disrupt the Company's operations.

(D) When a delivery area is permanently split more than fifty percent (50%), the driver who bid the original route will have the choice of the routes resulting from the split and in this event, his choice shall not be considered as a new bid.

(E) Full time seniority employees will select a bid job at the time of the annual bid. If an employee fails to select a bid he shall be assigned to a job, and such assignment shall be considered a bid for all purposes.

(F) If a seniority problem arises from a job reassignment within an inside shift, the matter will be referred to the Division Manager and the Local Union Representative for prompt resolution.

## Section 3 – Layoff

(A) In the event of a layoff occasioned by post Christmas volume decline, the least senior employee in the classification affected will be laid off or he may elect to displace the least senior employee in any other classification provided he is senior to the employee he is displacing. The displaced employees may then exercise his seniority in the same manner in any other classification until the least senior employee is laid off. In all other cases, when a bid job is consolidated, discontinued or suspended, the employee shall work as assigned. In the event the bid job is not restored after fifteen (15) workdays, the

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ANTHONY D. IZZI,
Plaintiff,

v.

UNITED PARCEL SERVICE, INC.,
Defendant.

C.A. No. 04-321T

**PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST REQUEST FOR ADMISSIONS**

**REQUEST NO. 1**:

Regulations of the Federal Motor Carrier Safety Administration govern UPS in the operation of motor vehicles.

**RESPONSE:**

Plaintiff objects to this request as it calls for a legal conclusion and calls for information protected by the attorney-client and work-product privileges, and as such, is inappropriate under Rule 36.

**REQUEST NO. 2:**

49 CFR section 390.5 defines "Commercial Motor Vehicle" as "any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property when the vehicle - -

(1) Has a gross vehicle rating or gross combination weight rating, or gross vehicle weight or gross combination of weight, of 4,536 kg (10,001 pounds) or more, whichever is greater; or
(2) Is designed or used to transport more than 8 passengers (including the driver) for compensation; or
(3) Is designed and used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or

(4) Is used in transporting materials found by the Secretary of Transportation to be hazardous under 49 U.S.C. 5103 and transported in a quantity requiring placarding under the regulations prescribed by the Secretary under 49 CFR, subtitle B, chapter I, subchapter C."

**RESPONSE:**

Admitted that 49 C.F.R. § 390.5, revised October 1, 2003, reads as set forth above in substance, although there are typographical errors in the form.

**REQUEST NO. 3:**

Pursuant to 49 CFR section 391.41(a) "A person shall not drive a commercial motor vehicle unless he/she is physically qualified to do so."

**RESPONSE:**

Admitted that this statement is part of the definition of 49 C.F.R. § 391.41(a), revised October 1, 2003.

**REQUEST NO. 4:**

Pursuant to 49 CFR 391.41(b) a person is "physically qualified to drive a commercial motor vehicle if that person," among other things "has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control."

**RESPONSE:**

Admitted that this statement is part of the definition of 49 C.F.R. § 391.41(b), revised October 1, 2003.

**REQUEST NO. 5:**

As of October 2002, and continuing to the date of the responses to these requests for admissions, plaintiff has an established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control.

**RESPONSE:**

Admitted that Plaintiff has had an established medical history or clinical diagnosis of diabetes mellitus since approximately May 2000. Plaintiff's diabetes has required insulin for control since approximately January 2001 to the present.

**REQUEST NO. 6**:

As of October 2002, and continuing to the date of the responses to these requests for admission, UPS could not lawfully allow the plaintiff to operate one of its vehicles if that vehicle has gross vehicle rating or gross combination weight rating, or gross vehicle weight or combined gross combination weight of 4,536 kg (10,001 pounds) or more.

**RESPONSE:**

Plaintiff objects to this request as it calls for a legal conclusion and calls for information protected by the attorney-client and work-product privileges, and as such, is inappropriate under Rule 36.

**REQUEST NO. 7:**

The majority of package cars used at the UPS facility where the plaintiff works have a gross vehicle rating or gross combination weight rating, or gross vehicle weight or combined gross combination weight of 4,536 kg (10,001 pounds) or more.

**RESPONSE:**

Admitted.

**REQUEST NO. 8**

By notice in the Federal Register dated March 25, 2004, plaintiff's application for a waiver of the federal diabetes standards for commercial drivers with insulin-treated diabetes mellitus was denied by the Federal Motor Carrier Safety Administration.

**RESPONSE:**

Admitted that by notice in the Federal Register dated March 25, 2004, plaintiff's application for an exemptions from the Federal Motor Carrier Safety Administration (FMCSA) diabetes standards applicable to interstate truck drivers with insulin-treated diabetes mellitus was denied by the FMCSA.

**REQUEST NO. 9**:

Plaintiff is represented for purposes of collective bargaining by Local 251 of the International Brotherhood of Teamsters, which has a collective bargaining agreement with UPS governing wages, hours, and other terms and conditions of employment.

**RESPONSE:**

Admitted.

**REQUEST NO. 10:**

Pursuant to certain provisions of the collective bargaining agreement between the Teamsters and UPS, package car routes are awarded by seniority during an annual bid.

**RESPONSE:**

Admitted that the collective bargaining agreement provides that the routes shall be awarded by seniority.

**REQUEST NO. 11**:

There are three routes out of the Warwick, Rhode Island facility that regularly use vehicles 10,000 pounds or under.

**RESPONSE:**

Plaintiff objects to this request because it is ambiguous and Plaintiff is unable to provide a response with information reasonably available to him at this time. Without waiving said objections, the request is denied.

**REQUEST NO. 12**:

Each of those three routes have been bid upon and filled since October 2002 by drivers with more seniority [sic] the plaintiff.

**RESPONSE:**

Plaintiff objects to this request because it is ambiguous and Plaintiff is unable to provide a response with information reasonably available to him at this time. Without waiving said objections, the request is denied.

Subscribed and sworn to before me this 17th day of September 2004, in Providence, Rhode Island.

Carly Beauvais Iafrate
Notary Public
My Commission Expires:

CARLY B. IAFRATE NOTARY PUBLIC STATE OF RHODE ISLAND

My Commission Expires January 26, 2008

**CERTIFICATION**

I hereby certify that a copy of the within Plaintiff's Response to Defendant's First Request for Admissions has been sent by first-class mail to Steven M. Richard, Esq., Tillinghast, Licht, Perkins, Smith & Cohen, 10 Weybosset Street, Providence, RI 02903 and Hugh F. Murray, III, Murtha Cullina LLP, City Place I, 185 Asylum St., 29th Floor, Hartford, CT 06103-3469 on the 20th day of September 2004.