UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANTHONY D. IZZI, Plaintiff, v. UNITED PARCEL SERVICE, INC., Defendant. | : | C.A. No. 04-321T |

**PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, Anthony D. Izzi ("Izzi") in the above-captioned case and pursuant to Fed. R. Civ. P. 56(c), objects to the Motion for Summary Judgment filed by Defendant United Parcel Service, Inc.

In support thereof, Izzi relies on the accompanying memorandum of law

Plaintiff,
By his Attorneys,

Carly Beauvais Iafrate, #6343
170 Westminster Street, #601
Providence, RI 02903
(401) 421-0966
(401) 351-4802 (fax)

Gerard P. Cobleigh, #0232
70 Jefferson Boulevard
Warwick, RI 02888
(401) 941-5900
(401) 461-4107 (fax)

**CERTIFICATION**

I hereby certify that a copy of the within document has been sent by mail to Lori Caron Silveira, Esq., and Timothy Bliss, Esq., Tillinghast, Licht, LLP, 10 Weybosset Street, Providence, RI 02903; Hugh F. Murray, III, Murtha Cullina LLP, City Place I, 185 Asylum St., 29th Floor, Hartford, CT 06103-3469; and Laurie Alexander-Krom, Esq., Murtha Cullina, LLP, 99 High Street, Boston, MA 02110 on the 15th day of August 2005.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ANTHONY D. IZZI,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **C.A. No. 04-321T** |
| **UNITED PARCEL SERVICE, INC., Defendant.** | : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**PAGE**


**I. DESCRIPTION OF MOTION ........ 1**

**II. FACTS ........ 1**

**III. ISSUES ........ 4**

**IV. POINTS & AUTHORITIES ........ 5**

**A. IZZI IS DISABLED ........ 5**

**B. IZZI CAN PERFORM THE ESSENTIAL FUNCTIONS OF THE JOB.... 7**

**C. IZZI'S REQUEST FOR ACCOMMODATION IS NOT UNREASONABLE.. 11**

**D. UPS HAS NOT SHOWN UNDUE HARDSHIP ........ 19**

**E. UPS FAILED TO INTERACT ........ 20**

**F. UPS DISCRIMINATED AGAINST IZZI BECAUSE OF HIS DIABETES.. 22**

**G. UPS'S PREEMPTION ARGUMENT FAILS ........ 23**

**V. CONCLUSION ........ 25**

**I. DESCRIPTION OF MOTION.** The Defendant, United Parcel Service, Inc. ("UPS"), has moved for summary judgment in this disability-discrimination case. Plaintiff, Anthony Izzi ("Izzi"), objects to UPS's motion and requests that any and all relief requested by UPS be denied.[1]

**II. FACTS.** By all accounts, Anthony Izzi was a valued, well-liked, and diligent package car driver. He enjoyed his job, and looked forward to a long driving career at UPS. All of that changed in October 2002, when UPS learned that Izzi was an insulin-dependent diabetic. Appendix A, ¶ 3. At the time, UPS had a policy called the Diabetes Protocol which specifically allows insulin-dependent drivers to drive for UPS. App. B, Diabetes Protocol, Plaintiff's Statement of Disputed Facts/Facts that Preclude Summary Judgment ("SDF") ¶ 15. The Diabetes Protocol required UPS to conduct an individualized assessment of Izzi's diabetes, and if he qualified, he could drive certain UPS vehicles. This policy was totally consistent with federal DOT regulations because the DOT only regulated vehicles over 10,001 pounds ("large vehicles").[2] 49 C.F.R. 390.5, 391.41. Since UPS has vehicles under 10,001 pounds ("small vehicles"), **that are not DOT regulated**, package car drivers, like Izzi, can still legally and safely drive small vehicles under the protocol.

Based on the fact that he was an insulin-dependent diabetic, a UPS doctor refused to give Izzi a DOT Card, a requirement for driving only large vehicles.[3] However, even without the DOT Card there was nothing preventing Izzi from continuing to drive small vehicles. At this point, the

[1]Consistent with the pre-trial order, Izzi has included only 20 pages of exhibits. If the Court requires any additional documents, Izzi requests the opportunity to supplement the record.

[2]Even with the federal law, there have even been waiver programs for diabetics. Recently, on July 29, 2005, Congress passed the Safe, Accountable, Flexible & Efficient Transportation Equity Act of 2005, H.R. 3 § 7111. This will allow Izzi to drive all vehicles after November 2005.

[3]Izzi's own physician, Dr. Robert J. Dobrzynski, a diabetes specialist had signed Izzi's DOT card based on his assessment that Izzi could safely drive. App. C. UPS refused to accept this card.

Diabetes Protocol had existed for seven years.[4] Even Julie Souza, UPS's Occupational Health Supervisor believed she knew about it at this point. Souza 93. Yet, Miranda was still following an out-of-date UPS policy that all of its drivers obtain DOT certification. App. A ¶ 5. Miranda told Izzi he could no longer drive for UPS because of his diabetes. App. A ¶ 6, SDF ¶ 15. Without engaging in the interactive process, Izzi was unilaterally removed from his driving position, his pay was cut substantially, and he was moved to a third-shift package loading job. Izzi 42-3, App. D, Izzi Affidavit ¶ 2, App. A, ¶ 5, Burke 51, 53-4. This was incredible in light of the Diabetes Protocol and the fact that federal regulations do not apply to all of UPS's vehicles and that there were driving positions that Izzi could have performed.

Izzi immediately asked Miranda if he could continue driving.[5] Izzi 41-2, 44, 96-7; App. A. ¶ 8. With no discussion, Miranda refused. App. A ¶ 5, 9, 10, Izzi 96-7. Undeterred, Izzi continued to ask Miranda for an accommodation. Burke 25-6, Izzi 53-4, 96-7, App. A, ¶ 5. Although Miranda should have directed Izzi to either Robert Burke, Health & Safety Manager, or Souza, he failed to do so. Izzi 96-7; App. A, ¶ 9, Burke 23, 52, Souza 53, 62. Miranda was not the only one to ignore Izzi's requests. For example, Izzi made similar requests to supervisors and union personnel, but, like Miranda, they failed to assist him. Izzi 53-4, 96-7, Murphy II 67-8.

It was not until December 2002, after Izzi persisted, that the union presented two grievances to Miranda on Izzi's behalf. Izzi 54, 57. The grievances expressly requested "a reasonable accommodation," to "continue driving," and "to drive a vehicle under 10,000 lbs. (which is allowed

---

[4]The Diabetes Protocol was distributed to management nationwide on June 16, 1995. See EEOC v. UPS, Inc., 149 F. Supp.2d 1115, 1134 (N.D. Cal. 2000) (according to the cover memo that accompanied the protocol, it was intended to be an individualized assessment relating to reasonable accommodation under the ADA). However, UPS did little to train its management on the Diabetes Protocol, the ADA Protocol, or any issues relating to requests for accommodations. See § E infra

[5]UPS has not provided any training or distributed any written policy to Izzi, or any hourly employees, regarding requests for accommodations. Burke 25-6.

by federal law)." Miranda rejected the grievances without determining if Izzi could drive a small vehicle. App. A. ¶ 9, 12, Izzi 56. For the next several months, Izzi continued to speak with Miranda about his request whenever he saw him. App. A ¶ 5. Izzi even sought outside assistance, but UPS did not budge. Burke 81-2, Murphy II, 68-70. [6]

By May 2003, UPS's inaction forced Izzi to file charges of discrimination with the Human Rights Commission. It was only at this point, seven months later, that UPS responded. Realizing what they should have done all along, UPS finally decided to evaluate whether Izzi was actually entitled to an accommodation under its ADA Protocol. Murphy I 188-90. This should have been a relatively simple analysis of Izzi's diabetes since Rhode Island law expressly provides that disabilities are examined in their unmitigated state. Contrary to their own policy, UPS evaluated Izzi only under the ADA's more stringent standard and determined he was not disabled and therefore, did not qualify for an accommodation. Souza 66-7, UPS Doc. 000494, ADA Protocol.

To make matters worse, no one even told Izzi he had been rejected. Souza 83-4, 90-1 (notification to be made within 3 business days). This was never done. Incredibly, Mark Murphy, employee relations manager asserted that it was only at this point, June 2003, that he, Burke and Souza "discovered" the Diabetes Protocol. Murphy I 185. Following this "discovery," UPS determined Izzi was qualified to continue driving, even without a DOT Card. Souza 95. Again, no one told Izzi this, and he continued to do his 3rd shift loading job. Collier 60.

For no apparent reason,[7] UPS waited another three months, until September 2003, to deny Izzi's request for accommodation. App. F, Collier Letter. Steve Collier, District Human Resources Manager, who supervised Burke and Souza, "wrote" the letter. App. F., Collier 21, 46-7. Collier

---

[6]Throughout this time, Izzi saw drivers with less seniority than him driving small vehicles. Izzi 94, SDF ¶ 12.

[7]Since no one engaged in any interactive process, there is no explanation for this delay. See infra § E. Collier said the purpose of his letter was not even to tell Izzi his accommodation had been rejected. Collier 59-60 & n.3.

concluded that, even though Izzi was qualified, he still could not drive. For the first time, UPS asserted that Izzi allegedly did not have the seniority to drive on any route that "required" the use of a small vehicle. App. F. Collier, however, did not perform any seniority or route analysis prior to making this decision. Collier 63-66. Collier said he relied on Souza and Murphy to "investigate the routes." Collier 63-4, 66. Souza and Murphy directly contradicted this - both said they were not involved in drafting the letter and did not investigate the routes. Souza 57, 102-03, Murphy II 5, 9, 11. Utterly failing to comply with its obligation, UPS rejected Izzi's request without engaging in any interactive process with Izzi to determine if he had any ideas for driving work in a small vehicle besides a fixed route that "required" one; or conducting any real analysis of its own. See infra § E. Since then, other than allowing Izzi to drive a small vehicle during a single holiday peak season, UPS has maintained its rigid position.

Izzi filed this action in state court alleging that UPS's actions constitute both a failure-to-accommodate and disparate treatment under state law. See R.I. Fair Employment Practices Act ("FEPA"), G.L. 1956 § 28-5-1 et seq.; R.I. Civil Rights Act ("RICRA"), § 42-112-1 et seq.; and the R.I. Civil Rights of People with Handicaps Act ("RICRPHA"), § 42-87-1 et seq.[8] UPS removed the action to this Court. Since filing, Izzi has continued to bid on driving jobs, for which he has enough seniority. Izzi 48, 53, 64, 66. UPS has not placed him in any of these jobs.

## III. ISSUES.

1. Whether Summary Judgment in Favor of UPS is Appropriate When it Does Not Dispute that Izzi is Actually Disabled?

2. Whether Summary Judgment is Appropriate When There is a Dispute Over Whether Having a DOT Card is an Essential Function of the Job?

3. Whether Summary Judgment is Appropriate When There is a Dispute Over Whether Izzi's Request is Reasonable?

---

[8]There is little distinction between the ADA, 42 U.S.C. § 12101 et seq., and state anti-discrimination laws. Accordingly, courts look to the ADA when deciding state law cases. Kriegel v. State, 266 F.Supp.2d 288, 296 (D.R.I. 2003). Any material differences are discussed infra.

4. Whether Summary Judgment is Appropriate When UPS Has Not Satisfied its Burden on Undue Hardship?

5. Whether Summary Judgment is Appropriate When UPS Utterly Failed to Engage in the Interactive Process?

6. Whether Summary Judgment is Appropriate When Direct Evidence of Discrimination Exists and there is no Reason for UPS's Adverse Action?

7. Whether Summary Judgment is Appropriate on Preemption When There is No Chance of a Conflict with Federal Law.

**IV. POINTS & AUTHORITIES**.

**A. IZZI IS DISABLED.** If anyone is entitled to summary judgment on disability, it is Izzi because, unlike the ADA, under state law whether a person has a disability shall be determined without regard to the availability or use of mitigating measures, such as medications. G.L. 1956 §§ 28-5-6(4), 42-87-1(1). Because the lack of insulin causes an insulin-dependent diabetic to die, Izzi easily satisfies the necessary elements. See Arnold v. UPS, Inc., 136 F.3d 854, 866 (1st Cir. 1998)[9] (diabetes, in its untreated state, is a disability); McCusker v. Lakeview Rehab. Ctr., 2003 WL 22143245 (D.N.H. 2003) (insulin-dependent diabetic is substantially impaired in seeing, hearing, speaking and performing manual tasks); Sarsycki v. UPS, Inc., 862 F. Supp. 336, 340 (W.D. Okl. 1994) (without insulin diabetic lapses into coma and dies - a substantial limitation).

The disability requirement can be satisfied by showing plaintiff has a physical impairment which substantially limits one or more of his major life activities." Carroll v. Xerox Corp., 294 F.3d 231, 238 (1st Cir. 2002); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999). According to Dobrzynski, who is board certified in diabetes and endocrinology, Izzi has Type 1 Diabetes Mellitus, a disorder of glucose metabolism. App. C, ¶ 2, 3; see also Fraser v. Goodale, 342 F.3d 1032, 1038 (9th Cir. 2003) (diabetes is a physical impairment). Diabetes can lead to

---

[9]Izzi relies on pre-Sutton cases as examples. Although they are no longer good law for purposes of the ADA, they are forceful here because the state-law analysis is identical to the "without mitigating measure" analysis that existed pre-Sutton. See G.L. 1956 §§ 28-5-6(4), 42-87-1(1); Sutton v. United Air Lines, 527 U.S. 471 (1999).

complications like blindness, heart disease, kidney disease and neuropathy. App. C ¶ 6. Without medication, Izzi's diabetes would substantially limit major life activities. App. C ¶ 6, 7. Specifically, if Izzi stopped taking his insulin, he would develop various symptoms, lapse into a coma and ultimately die. App. C ¶ 7. Death would substantially limit Izzi's ability to function in any capacity, including walking, seeing, speaking and performing manual tasks. Id.

Faced with this hard reality, UPS does not contest the fact that Izzi is disabled and that his disability substantially impairs a major life activity. Instead, UPS incredulously asks the Court to ignore the facts, and find that Izzi cannot establish his disability because of a supposed admissibility problem with Izzi's physician's testimony.[10] This argument cannot be taken seriously in light of the

---

[10]UPS argues that Izzi needs expert testimony to show that he would be substantially limited in a major life activity without medication. UPS says because Izzi has allegedly not disclosed the use of any expert he cannot prevail. UPS Memo § A. This argument lacks credibility for several reasons. First, no expert testimony is even required when the substantial limitation is obvious and can be determined by common sense and/or personal knowledge. See, e.g., Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11, 24(1st Cir. 2002) ("[w]e would not demand, for example, that a paraplegic expound on the many scenarios in which she is unable to walk"); Hayes v. UPS, Inc., 17 Fed Appx. 317, (6th Cir. 2001) (plaintiff's description of limitation is sufficient for fact finder using common sense); EEOC v. Walden, 2002 WL 31011859, at *14-15 (S.D.N.Y. 2002) (expert testimony is not required to show impairment is substantial as compared to the average person). In this case, Izzi's testimony alone is sufficient. In his Answers to Interrogatories, Izzi states that he has diabetes and that without insulin, he would ultimately die. App. G, Answers No. 10, App. B ¶ 1. UPS tries to limit Izzi to his deposition testimony but UPS did not ask what would happen if he never took his insulin. Obviously, Izzi knows that if he never took insulin again, he would die. Izzi Aff. § 1.

Also, Dobrzynski (a diabetic himself) can testify in a non-expert capacity as Izzi's treating physician. See Mohney v. USA Hockey, Inc., 2005 WL 1655023, at *5-6 (6th Cir. 2005). In Mohney, plaintiff's treating physician's affidavit was not excluded to the extent that it was based on his personal knowledge and treatment of plaintiff. This was true even though plaintiff did not list his doctor as an expert and made no expert disclosure under Rule 26(a)(2)(B). Id. at *6. This is because the doctor was not testifying as an expert. Id. Even if a portion of Dobrzynski's testimony is considered expert testimony (the hypothetical), a contention Izzi contests, there is nothing preventing him from being an expert. Izzi disclosed Dobrznski in his Rule 26 Initial Disclosure. Izzi set forth the matters upon which Dobrzynski may testify, which included the whether Izzi has a disability. In September 2004, Izzi produced Dobrzynski's medical records even though they were not requested by UPS. UPS never sought to take his deposition. UPS did not issue an expert interrogatory until July 1, the official discovery closure date. Izzi timely responded and has since supplemented that answer. No motion to compel has been filed. Izzi has now sent UPS an expert disclosure, even though is not required until 90 days

applicable rules, and the fact that UPS has long-known about Dobrzynski, and his expected role in this case, yet chose not to take his deposition.

Based on the foregoing, UPS cannot possibly prevail on summary judgment.

**B. IZZI CAN PERFORM THE ESSENTIAL FUNCTIONS OF THE JOB.** UPS's essential functions argument is even less persuasive than the one it made on disability. There is no dispute that Izzi can perform the true essential functions of the package car driver job - the ones actually involved in delivering and picking up packages. App. C ¶ 8; Souza 102-03. Because UPS has no other argument to make, it says the ability to drive all UPS vehicles is an essential function for its package car drivers.[11] UPS Memo § C(ii)(c), (d). This is the same thing as saying that all drivers need DOT Cards.. Surprisingly, UPS still takes this position when it is contrary to established case law, its own Diabetes Protocol, and the facts developed in this case. See e.g., Bates v. UPS, Inc., 2004 U.S. Dist. Lexis 21062 (N.D. Cal. 2004) (rejecting UPS's argument that having a DOT Card is an essential function); Morton v. UPS, Inc., 272 F.3d 1249 (9th Cir. 2001) (same); EEOC v. UPS, Inc., 149 F.Supp.2d 1115 (N.D. Cal. 2000) (same) (reversed on other grounds, 306 F.3d 794 (9th Cir. 2002); Sarsycki, 862 F.Supp. at 340 (same).

First, other courts have already held that UPS package car drivers do not have to have DOT

---

before trial. No trial date has been set. No shorter time has been set by the pre-trial order, which requires only that identity be disclosed upon request. Finally, an expert disclosure under Rule 26(a)(2)(B) is required only for experts who are "retained" or "specially employed." Dobrzynski is neither of those two things. Critically, UPS cannot show any harm has resulted. Sherrod v. Lingle, 223 F.3d 605, 613 (7th Cir. 2000). UPS cannot seriously contend that it could have presented any expert evidence to the contrary or that there is any surprise that Dobrzynski says Izzi would be substantially limited sans insulin.

Finally, UPS ignores the relevant standard on summary judgment regarding admissibility of evidence. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing cases); Celestino v. Montauk Club, 2002 WL 484685, at *27 (E.D.N.Y. 2002) (citing Celotex Corp. v. Cartrett, 477 U.S. 317, 324 (1986) (a party need not produce evidence in a form that would be admissible at trial to avoid summary judgment). It is clear there is no admissibility problem here.

[11]An essential function is a "fundamental job duty." Kriegel, 266 F. Supp.2d at 298. UPS bears the burden of proving that a function is essential. See Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 35 (1st Cir. 2000) (collecting cases).

Cards or the ability to drive all vehicles. Bates, 2004 Lexis 21062 at *2. Bates was a class action brought by deaf individuals who challenged UPS policy requiring all drivers to be DOT qualified because UPS had vehicles that were not DOT regulated. 2004 Lexis 21062, at *2. After throughly investigating UPS's operations, the Bates Court found UPS's policy violated the ADA and that having the ability to drive all vehicles was not an essential function of the job because some package car driving positions did not require the ability to drive DOT vehicles. Id. at 36-7, 127. Because some driving positions could be done only in small vehicles, a DOT Card, and the ability to drive all vehicles was totally unnecessary. Id.[12]

Bates alone makes summary judgment improper here, because like in Bates, UPS has admitted in this case that all drivers do not have to drive all vehicles. SDF 24. In fact, UPS has allowed package car drivers, on over 100 occasions, to drive without DOT Cards. UPS Adm. Nos. 2, 3[13]; Bates, at * 37. Many of these 100 drivers, cannot drive all vehicles. Adm. No. 2-5. For example, as of August 2002, 75 package car drivers were employed by UPS driving only small vehicles. SDF 25, Bates, at *37. UPS has not restricted this practice to a certain part of the country - it has happened in 32 States and in D.C. SDF 27.[14]

---

[12]For extra measure, the Kriegel case confirms Izzi's position. Id., 266 F. Supp.2d at 298. In Kriegel, the issue was whether it was an essential function for sheriffs to cover all courtrooms. Although all sheriffs rotated covering four different courtrooms, plaintiff's vision disability prevented him from covering two of them. Id. The Court found that sheriffs were only required to cover the courtrooms in dispute twice a month, and thus, it was a marginal function. Id. Here, there is evidence that some drivers never have to drive large vehicles. See n. 13 & UPS Adm., Ex. A.

[13]During discovery, Izzi obtained a document, entitled "UPS Supplemental Discovery Responses Re: Efforts Made to Allow Individuals Who Are Not DOT Qualified to Obtain or Retain Driving Positions," which was part of the Bates case. UPS Adm., Ex. A. UPS then admitted the genuineness of the document. This document details the many situations in which UPS has accommodated drivers without DOT Cards in small vehicles.

[14]UPS does not argue that there is anything different about Rhode Island that makes having a DOT Card essential or Izzi's request unreasonable. Even if it did, Izzi would hotly contest UPS's ability to claim this now because of what happened at the July 27, 2005 hearing on Izzi's motion to compel nationwide discovery. Izzi sought nationwide discovery on all UPS non-

Even without Bates, UPS has specific policies, like the Vision and Diabetes Protocols which expressly state that UPS allows DOT disqualified drivers "to operate specific UPS vehicles." App. B, Bates, at *37, SDF 15. Like in Bates, the existence of these protocols "undermines UPS's argument that it cannot occupy a non-DOT certified driver with full-time driving work. There would be no point to having these protocols, and allowing non-DOT certified individuals to be package car drivers, if those individuals would not be able to fill any driving position whatsoever." Bates, at *38; see also Gillen, 283 F.3d at 28 (employer cannot argue that two-hand lifting is an essential function after hiring one-handed person for the job); EEOC, 149 F. Supp.2d at 1171 (stating that if no one could drive under the protocol, it would have been a "sham and dangled false hope" and "this alone convinces the court that it is not an essential function to be able to fill in for any and all drivers").

Even further evidence that the ability to drive all vehicles is not essential is the fact that UPS has already found Izzi qualified under the diabetes protocol. Souza 95. There would have been no point to actually administering this protocol to Izzi, if there were no driving positions he could hold without a DOT Card[15] See EEOC, 149 F. Supp. 2d at 1171-72. And, even after UPS refused Izzi an accommodation, it assigned Izzi to drive only a small vehicle during peak season 2003. Collier 17. No one said Izzi needed to have the ability to drive all vehicles, and his route was not specially classified in any way. Izzi Aff. ¶ 3-5, 10.

---

DOT drivers. This request was denied by the Court after UPS argued it would not be relying on this type of argument, and specifically, would not be moving for summary judgment on reasonableness. UPS should now be barred from changing its position. In all events, UPS could not establish that there is anything different about R.I. that makes having a DOT Card an essential function because UPS employs the same route design systems nationwide. SDF 34, EEOC, 149 F. Supp. 2d at 1122-26. Even Collier said that Marietta, GA, a city where a non-DOT qualified driver is allowed to drive was similar to a Warwick or Providence, RI. SDF 35.

[15]Notably, the Diabetes Protocol does not provide that there are any limits to the type of driving job that can be performed by someone who qualifies. App. B, UPS Adm., Ex. A (detailing the hundreds of situations in which drivers, including package car drivers, are not driving all vehicles). UPS cannot argue that it only put Izzi through the protocol so that he could be an air or peak driver since those options were not even mentioned by Collier. App. F.

Even without Bates, there is a significant amount of evidence that having the ability to drive all vehicles is not an essential function for all package car drivers. This is because in Izzi's own building there are at least eight package car drivers who do not have to drive all vehicles.[16] SDF 31 App. H, Reddy 51. There is no difference between the functions performed by drivers of small and large vehicles. SDF 32, 9. They all deliver and pick up packages. Id. The fact that an employer does not require all persons holding the same position to perform the alleged essential function creates dispute of fact on that issue. See Gillen, 283 F.3d at 27.

Even more compelling is the fact that UPS's argument flies in the face of its own job description which lists the essential functions of the package car driver job and does not include DOT certification or "the ability to drive all vehicles" as an "essential function." SDF 28, App. C, Ex. A. Only in the "overview" section and not under "essential functions" does UPS mention the ability to meet requirements "as specified by the DOT." Id. When confronted with this reality, Murphy put the final nail in the UPS's coffin on the essential functions argument. Murphy stated that one can be a package car driver of only a small package car and still be performing the essential functions because "you're within DOT requirements if you're driving an under 10,000 pound vehicle." Murphy II 32-3, SDF 30.

Based on the foregoing disputes, a reasonable juror could find that all package car drivers do not need to drive all vehicles, and thus, it cannot be an essential function.

## C. IZZI'S REQUEST FOR ACCOMMODATION IS NOT UNREASONABLE.

Izzi's request was to be allowed to continue driving small vehicles. He could do this as a

---

[16]UPS has not said these drivers do not or could not drive small vehicles 100 percent of the time. If UPS did, Izzi disputes this. First, UPS has said that there are at least 3 routes that require a small PC (and thus cannot utilize a large PC). SDF 27. Also, Reddy stated that some small vehicle drivers may have the exact same truck for 25 years. SDF 29. In addition, because P50s (a particular type of vehicle) are interchangeable, any driving done by these 8 drivers on P50s can be counted as small vehicle driving. SDF 1, 33. See infra n.21 & § C (detailing how large vehicles can easily be switched with small vehicles).

fixed route driver, on an existing route or a modified route. He could also be a cover driver, only driving small vehicles. A "fixed route" package car driver is one that generally drives the same geographic area each day. The actual route and stops vary daily. Even though the route is fixed, UPS can still have the driver deliver outside of that area on a given day. Murphy I, 115. By comparison, a cover driver, among other things, covers for absent drivers, does "extra" work, or works inside. See infra p. 15-6. Focusing only on two ways that Izzi could potentially drive a small vehicle, UPS now argues that Izzi's requests are unreasonable.[17] For several reasons, these arguments are unpersuasive.

UPS first relies exclusively on U.S. Airways, Inc. v. Barnett and argues that if it put Izzi on a fixed route with a small vehicle, seniority would be violated, which makes it an unreasonable accommodation. 535 U.S. 391 (2002). Yet Barnett is easily distinguished. First, UPS wrongly assumes that all fixed route drivers who drive small vehicles have more seniority than Izzi. UPS SOF ¶ 12. There are facts showing that Izzi has more seniority than G. Coogan and could bid on his route.[18] App. H, Reddy 51-2, Izzi SDF ¶ 16-20. Izzi has a seniority date is September1996, which is two years earlier than Mr. Coogan's. App. H, SDF 18-19.

Even if all of the fixed route drivers of small vehicles did have more seniority than Izzi, Barnett does not automatically render the request unreasonable. Office of the Architect v. Office of Compliance, 361 F.3d 633, 641 (Fed. Cir. 2004) (citing Barnett, 535 U.S. at 391). The employer in

---

[17]UPS has not moved for summary judgment on the theory that Izzi made no request or that his request was unclear. Based on these facts, it would be impossible to do so. See, e.g., Reddy 43. Even if it did, it cannot use its own failure to engage in the interactive process as a reason why they did not know what he was asking for. Infra § E.

[18]Reddy said that because Izzi had more seniority he could bid on Coogan's job. Reddy 51-2. UPS stated that Coogan's seniority date was a typographical error. Despite repeated requests for UPS to revise the document, Izzi never received a revised copy. Murphy II 55. In addition, UPS changed its Interrogatory Answer on this point 3 times. First, when asked if anyone with less seniority drove a small vehicle, it referred Izzi to App. H., Answ. No. 10. Then, UPS revised its answers and said there were no such drivers. Supp. Answ. No. 10. On the third revision, UPS again said there were drivers of small vehicles with less seniority, but did not identify them. 2nd Supp. Answs. No. 10.

Barnett argued that placing a disabled employee in a position that would otherwise be filled by a more senior employee would be preferential treatment. Id. In response, the Court stated that "by definition any special 'accommodation' requires the employer to treat an employee with a disability differently, i.e., preferentially." "[T]he fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach."

In cases where there is an apparent conflict, the employee can show "special circumstances warrant a finding that a particular accommodation is nevertheless reasonable." Id. (citing Barnett, 535 U.S. at 405) For example, if the system already contains exceptions, then "one further exception is unlikely to matter." Office, 361 F.3d at 642-63; Norman v. Univ. of Pittsburgh, 2002 WL 32194730, at *17 (W.D.Penn. 2002) (summary judgment is not appropriate on the question of why an accommodation cannot be made when, despite the CBA, it has been done before).

Barnett is not controlling here because UPS has admitted that in the past it has created jobs for drivers who cannot get DOT Cards and not allowed others to bid on those jobs. UPS Adm. 18, SDF 43; EEOC, 149 F. Supp.2d at 1137. UPS says these accommodations did not violate seniority because they were "unique positions created for particular individuals, which would not otherwise have existed and which were not governed by the terms of a CBA." Id. The only reason they were not governed by the CBA is because UPS and the Union agreed to it. UPS Adm., Ex. A, p.19-20. There is no reason why this was done for other employees, but cannot be done for Izzi. UPS's own ADA protocol provides that making exceptions to the CBA is a way to provide an accommodation. UPS 00553-554, SDF 44.

Significantly, there is evidence that this was done in Rhode Island for a driver named Jim Whittaker, who suffered a back injury. Reddy 66-7, Izzi Aff.¶ 6, SDF 45. Whittaker told Izzi that his route was created for him and was not subject to the bid. Izzi Aff. ¶ 6. As Reddy put it, if UPS decided to put Izzi on a route with a small vehicle, the Union would not mind. Reddy 27-8, 71-2 (if it was an "ADA thing," he would back off, even if a more senior person complained).

Summary judgment cannot be appropriate here, where there is sufficient evidence for the jury to find that Izzi's request is still reasonable, even considering seniority.[19]

UPS also moves on a separate issue, that the law does not require it to allow Izzi to be a cover driver, driving only small vehicles. This argument is similarly without merit.[20]

The position requested by Izzi, a cover driver who only drives a small vehicle, cannot be a new job because there are many other drivers already doing it. UPS Adm. No. 9 (recognizing 17 other situations in which UPS has allowed unassigned drivers to only drive small vehicles), SDF 8, App. E. First, Frank Medeiros is a cover driver in Rhode Island who only drives small vehicles. SDF ¶ 6, App. H, App. I. Based on this, Izzi disputes UPS's statement that no present cover driver only drives small vehicles. SDF ¶ 10. In addition, there is a significant amount of cover driving work already being performed in R.I. on small vehicles. App E, SDF 13.

Incredibly, and ignoring Medeiros, UPS still insists Izzi's request is unreasonable. UPS has relied on a single case, Phelps v. Optima Health, Inc., 251 F.3d 21 (1st Cir. 1997) to support its contention. That case is vastly different than the instant scenario. In Phelps, the nurse asked to dispense medication, a single function, and not perform her normal nursing tasks, like patient care.

---

[19]UPS assumes that if it places a small vehicle on a route for Izzi (as opposed to giving him one that already exists) this route would become desirable and a more senior person will bid Izzi out of the route. There is no evidence that this would happen. Poirier 77 (the majority of drivers don't care about the vehicle, they care about the type of route), SDF 49. Drivers cannot even tell what vehicle is on a route when they look at the bid. SDF 48. UPS retains the right to change vehicles on the routes. SDF 47. In R.I., even though there is an annual bid, UPS has no obligation to move the person to the route in any period of time which means the next bid can occur and the bidder did not even get onto the route he bid the prior year. Persuitte 27-8. Potential seniority conflicts cannot render a request unreasonable. See Dilley v. Supervalu, Inc., 296 F.3d 958, 963 (10th Cir. 2002). Even according to the ADA protocol, the route can be assigned outside the bid. UPS 00553-554.

[20]UPS has not challenged the fact that Izzi has plenty of seniority to be a cover driver. SDF 9. As of the February 2005 bid, Izzi had more seniority than approximately all but 9 of the 76 cover drivers. Id. Since cover drivers are not selected for routes by seniority, UPS cannot argue that a more senior cover driver would have"first picks" to cover a route on a small vehicle. SDF 10.

Id. at 24. Izzi is not asking to perform only one function of his job. As a cover driver he would still do what other cover drivers do, deliver and pick-up packages. SDF 32 Adjusting a piece of equipment - in this case, a vehicle, does not render the job new or remotely similar to Phelps. Thus, Phelps is of no assistance to UPS. Reddy 26, 71-2 (if management puts a small vehicle on a route that does not create a new job, and is not a contract issue).

Izzi's position is even more reasonable in light of Morton. Morton was a UPS employee who was denied promotion to a driving position because she could not get a DOT Card. 272 F.3d at 1251. She sought a "swing driver" position which is similar, if not identical, to the cover position. Id. at 1252, SDF 7. In Morton, UPS failed to show that driving only small vehicles as a swing driver was unreasonable or would create an undue hardship. Id. at 1255. UPS now tries to distinguish Morton, and argue that the circumstances in Arizona were more amenable to allowing Morton to only drive small vehicles. For a variety of reasons, no statement could be more inaccurate. This is because Morton had no seniority - Izzi has nearly 10 years of seniority which means a significant amount of routes are available to him, and his chances of keeping the route even greater. Morton was even more restricted because she was limited to covering a certain group of routes. Here, UPS's "building cover" position enables Izzi to cover any of the 200-plus routes that exist. SDF 14. UPS also argues that there was no annual bid in Arizona. However, in Morton any position that opened up was subject to bid immediately.

UPS also talks about the flexibility necessary for a cover position. This argument is the same as the one UPS made above with respect to the supposed essential functions of the job. UPS's first mistake is assuming that all cover drivers have the same amount of flexibility. All cover drivers do not drive different routes every day. SDF 2-6. There is at least one "cover" driver, Frank Medeiros, who does not have any flexibility because he drives the same route every day. SDF 6. He does not cover for a wide variety of routes on a daily basis. Id. Instead, he services airports and does inside work as directed. Reddy 73-4,79, Faidell 50-1. Izzi also disputes that cover drivers only cover for

absent drivers. SDF ¶ 2-6. Not only do cover drivers cover absences, but they also can be assigned to "spare" routes or do overflow work.[21] SDF ¶ 5. Some cover driver can drive the same route for months, or even a year. SDF 4Cover drivers can perform inside or non-driving work. SDF ¶ 3, Reddy 15, Murphy I 144, Poirier 76.

Importantly, UPS had conducted no analysis of how Izzi's flexibility as a cover driver would compare to the average cover driver. SDF 11. There is no average amount of routes a cover driver must be able to cover. Murphy I 135. UPS has presented no evidence that Izzi would be any more limited in what routes he could cover because of vehicle size as compared to a cover driver who is limited because of ability.

There are additional factors which make the cover driver proposal reasonable. UPS does not require cover drivers to know the routes in advance. SDF 11. UPS cannot argue that it will have nothing to do with Izzi if no fixed route drivers who drive small vehicles are absent. This is because, as noted above, UPS has a variety of uses for cover drivers. SDF 3-8. And, when there are extra cover drivers, UPS offers other drivers the day off or inside work so that the cover driver will not have to be paid for not working. SDF 4. The more senior drivers usually take time off because "[t]hey're older and more tired." Murphy II, 57, SDF 4. Since these are the drivers more likely to be driving small vehicles, this is an ideal situation for Izzi as a cover driver. App. H. Plus, there is

---

[21] For example, there is no reason that Izzi could not drive small vehicles when volume spikes, which is not just during the holiday season. Persuitte 76-7, Faidell 4, 50, Collier 82, Reddy 58. In 2004, Izzi asked to drive during the holiday season. Izzi 74. Although Murphy said he told Persuitte to make peak driving available to Izzi, Persuitte said he had never talked to Murphy, or anyone else, about Izzi driving during peak. Murphy II 24-6, Persuitte 81-2. When Izzi asked supervisor Chris Schwab, Schwab initially told him he needed drivers and would look into it. When Izzi asked again, Schwab told him he had enough drivers. Id. In reality, UPS hired approximately 30 non-UPS drivers to work during the peak season 2004. Persuitte 77-8. UPS also hires from the outside during the summer to cover vacations. Persuitte 83. Vacations are bid by seniority and drivers with more seniority have more vacation. Persuitte 82-3.

no evidence this would happen any more frequently with Izzi, than another cover driver.[22]

There is other evidence not even considered by UPS which makes summary judgment totally inappropriate. UPS has totally failed to contradict any of Izzi's evidence that switching vehicles or modifying routes are reasonableness accommodations. In February 2005, there were approximately 222 fixed bid routes. UPS 00606-619. Izzi has enough seniority to bid on and occupy 82 of these routes. SDF 50. UPS has many different size vehicles. UPS 00070, 00701-706, SDF 52. There is no reason why UPS could not "switch" vehicles and place a small vehicle on a route that currently has a large vehicle.

It makes sense that vehicles can be switched because (1) package cars are not dispatched 100 percent full and (2) there is not a significant difference in the cubic feet of cargo space between some small vehicles and some large vehicles. Poirier testified that package cars are dispatched between 60-70% full. SDF 51. With respect to cubic feet of cargo space, UPS Warwick has three types of small vehicles, the P32, P47D and the P50.[23] UPS 00070. P32s have 320 cubic feet of cargo space; P47Ds have 470; and P50s have 500. Persuitte 65, UPS 00701-706.

The smallest of the large vehicles is a P57. Id. The difference in cubic feet of cargo space between the P50 and P57 is a mere 70 cubic square feet. Therefore it is highly likely that any route performed in a P57 could be done in a P50. Murphy I 84 (P57s are just coming out now). The next largest PC is the P60. According to Persuitte, the load of a P60 - a large vehicle - can fit into a P50 - a small vehicle. SDF 54. Persuitte also said the load in a P50 could fit into a P47. Persuitte 65-6.

---

[22]An employer cannot merely argue that the proposed accommodation would have snowball effect because "it runs counter to the general principle behind the ADA that imposes a duty on the employer to modify some work rules, facilities, terms, or conditions to enable a disabled person to work, and if [the employer's] position were given credence, it would defeat almost any reasonable accommodation." Ward, 209 F.3d at 36-7.

[23]Izzi considers the P50 to be a small vehicle. Small and large P50s are interchangeable because they have the same cubic feet of cargo space. UPS Adm. #1, Persuitte 65. District-wide UPS has at least 7 small P50s that could replace any large P50s in Warwick since vehicles can be exchanged throughout the district. SDF 57.

Ron Poirier agreed that because vehicles are not loaded full, some loads could fit into small vehicles. SDF 54, Poirier 64-5, 38 (where a smaller PC will do it is usually the better option) 65-6 (approximately 20 percent of the routes out of Warwick could probably be done in a P50).[24] Poirier 65-6, SDF 55.

UPS cannot dispute this is a reasonable accommodation because UPS has switched vehicles as an accommodation for other drivers. SDF 56, UPS Adm. 10; EEOC, 149 F. Supp. 2d at 1137. Yet, UPS has refused to even consider doing this for Izzi. In fact, UPS has refused to analyze any of the 82 routes that Izzi has sufficient seniority for to see if they could fit into a small PC. Persuitte 66, Poirier 64, 75. There are enough small vehicles in Warwick. SDF 58, 59.

Even if a small vehicle on one of the 82 routes would occasionally be a containment problem, there is no evidence this would happen any more frequently to Izzi than it does to the average driver. When this occasionally happens to other drivers, UPS shifts the work to another driver or allows things like "double-tripping" where the driver comes back to the building to reload packages that did not initially fit. Faidell 23, Persuitte 60-1, Poirier 54, Burke 79, SDF 42. Likewise, there would be no problems with containing pickups. Poirier 34. Even unplanned pickup customers call a day in advance which gives management time to make adjustments. Faidell 60, SDF 61.

Despite this, UPS has not presented any evidence that it conducted any inquiry at the building level, whatsoever, with respect to the number of small vehicles available, on what routes they were driven, or on what routes they could be used. UPS has produced no evidence why this arrangement can be done for other DOT disqualified drivers or because of volume or customer service, but cannot be done as an accommodation for Izzi.[25] Reddy 69.

---

[24]Approximately 20 percent of 222 routes is 44 routes.

[25]Instead, this accommodation is clearly reasonable. Persuitte agreed that UPS may be assigning the large vehicles to routes unnecessarily just because the majority of its vehicles are large. Persuitte 67. Even Poirier said that UPS does not check on a frequent basis to see if the vehicle is the best fit. Poirier 78.

UPS could also modify a route for which Izzi has sufficient seniority, and then assign a small vehicle to the route. This is because the routes are modified on a daily basis to balance work load, among other things. SDF 38, Poirier 51-3. Some background in UPS operations is necessary for this discussion. See also Bates, at *2-32 (describing UPS operations); EEOC, 149 F. Supp.2d at 1122-26 (same). At any given time of the year, there can be anywhere from 210 to 315 routes dispatched out of Warwick. SDF 62. The number of stops on a route varies depending on the miles that need to be driven and volume of packages. If the route has a high amount of miles, it has less stops. Faidell 37. UPS's route design is the same nationwide. SDF 34. UPS wants all the routes to be performed between 8 and 9.5 hours, although this does not happen all the time. SDF 40. Before the drivers arrive, the Package Dispatch Supervisor ("PDS") looks at the plan that IE has chosen for the day, and then changes the plan so that the right number of routes are dispatched. Faidell , Poirier 11, Persuitte 68. The PDS uses a computer program that allows them to move work (number of stops) between drivers. Faidell 8, 19-21, Poirier 14, 25, Persuitte 56-7. These adjustments are made on a daily basis. SDF 38, 39. Thus, UPS already shifts work to other drivers on a daily basis. There can be no conceivable reason why one of the 82 fixed routes that Izzi has sufficient seniority for cannot be modified slightly (stops moved) so that the load fits into a small vehicle on a daily basis. Not to provide equal stops but equal amount of planned work (including stops and driving) Poirier 36. However, route times still vary between 8-9.5 planned, and less than 8 and more than 15 in reality. Persuitte 50-1, Faidell 44-5 . UPS has not even looked at the 82 routes to see if this is feasible. It might be that it is a difference of only a few stops. UPS Adm., Ex. A, p. 10-15. The parties agree that a route can be modified up to 50 percent without creating a new route.

UPS's failure to make this accommodation is senseless, especially in light of the testimony from Poirier and Persuitte that some vehicles could be switched without even making adjustments. In addition to shifting the work in the computer, UPS can move work among drivers physically, even after it is loaded on the vehicles. Poirier 51, Persuitte 58. In addition, because the number of routes

vary on a daily basis, UPS has to decide the number of stops (and packages) on a route that is put in when volume increases. UPS could select a plan for this, and then make any necessary adjustments like it does every day, for every other route. Faidell, Persuitte 56-7. They easily did this in Christmas 2003 when they allowed Izzi to drive.

UPS has presented no evidence that a modified route would necessarily take less than 8 hours. See, e.g., EEOC, 149 F. Supp. 2d at 1137 (allowing driver restricted to under 10,001 pound package car to shift work to another driver and does not create any problems delivering packages on time and in sequence). This is especially true since there are already routes in Rhode Island that are planned for small vehicles, and no evidence that those routes are inefficient. Even more compelling is the fact that UPS has modified routes for other UPS drivers who have lost their DOT Cards. SDF 63. UPS has given absolutely no reason why this can be done on a daily basis to balance work, for customer service, and for other DOT disqualified drivers, but cannot be done for Izzi. Poirier 52-3, Faidell 54.

**D. UPS HAS NOT SHOWED UNDUE HARDSHIP.** UPS does not appear to have moved for summary judgment on undue hardship. Therefore, UPS should be precluded from doing so in its reply.[26] There is no question that UPS has the burden to show undue hardship. See Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259-60 (1st Cir. 2001). An undue hardship must be a "significant difficulty or expense." Ward, 209 F.3d at 36 (citing 29 C.F.R. § 1630.2(p)(1)). When plaintiff presents some evidence of reasonableness and the employer does not present any evidence of undue hardship, summary judgment in the employer's favor should be denied. See Garcia-Ayala

---

[26]UPS has said that under state law it must only show "hardship" or that the accommodation will be a "major cost" and that somehow, this is less stringent than the "undue hardship" language in the ADA. UPS ignores § 42-87-3(6) which specifically states that the RICRPHA should be interpreted consistently with the ADA. See also Kriegel, 266 F. Supp.2d at 297 n.5 & 6 (addressing differences in language between ADA and RICRPHA and pointing out that the distinctions are likely meaningless and a result of inartful drafting). In addition, the State Supreme Court has noted that failure-to-accommodate claims under FEPA are analyzed in the same manner as those under the ADA. DeCamp, C.A. No. 04-31 Appeal, p. 18, n.14.

v. Lederle Parenterals, Inc., 212 F.3d 638, 650 (1st Cir. 2000); Ward, 209 F.3d at 38.

Here, UPS's only passing reference to hardship is its statement that if any accommodation violates seniority, the union could potentially sue for breach of contract. This argument is plucked out of thin air. It has no basis in fact or reality - especially since Reddy testified that he has no problem with UPS assigning a small vehicle to Izzi. Reddy 27-8, 71-2 & n.18. In all events, it is undisputed that UPS is a billion-dollar company with virtually unlimited financial resources. UPS 00887 (Annual Report). There is not an iota of evidence that there would be any cost or other negative impact that amounts to an undue hardship in this case, and thus, UPS cannot prevail on summary judgment.[27] See Garcia-Ayala, 212 F.3d at 650, Murphy II 96.

**E. UPS FAILED-TO-INTERACT.** In this case, UPS totally ignored Izzi requests and never engaged in a good-faith interactive process. A failure-to-interact is a failure to provide a reasonable accommodation that amounts to a violation of the ADA. Calero-Cerezo v. DOJ, 355 F.3d 6, 24-5 (1st Cir. 2004); EEOC, 2002 WL 31011859, at * 23 (describing process).[28] Here, there can be no dispute that pursuant to the Diabetes Protocol UPS was not supposed to automatically disqualify drivers who could not get DOT Cards because of their diabetes without first making an individualized assessment. EEOC, 149 F. Supp.2d at 1134. Yet, this is exactly what UPS did.

As discussed in the fact section, p. 2-4, despite Izzi's repeated requests, UPS did not interact with Izzi at any time between October 2002 and May 2003. Izzi 53-4, 96-7, App. A ¶ 5. UPS disregarded the Diabetes and ADA protocol when it demoted Izzi without even addressing his request for accommodation. Even after UPS received Izzi's charges of discrimination, when UPS

[27] Izzi also incorporates his arguments made on reasonableness, p. 11 to 19, here.

[28] When an employer fails to engage in the interactive process, it bears the burden of proving no reasonable accommodation could have been achieved, had it engaged in the interactive process in good faith. Morton, 272 F.3d at 1256 (the jury is entitled to decide if the employer had participated in good faith, there could have been other, unmentioned possible accommodations).

was forced to evaluate Izzi's requests, Murphy made clear that UPS did not take Izzi seriously. As Murphy put it "[Izzi] could have asserted he wanted to drive, and he could do it by bicycle. It wouldn't have made any difference to me if he's saying under 10,000 pounds, do it from a helicopter or whatever * * *." Id. 174.[29] Based on this approach, UPS decided Izzi was not disabled, never evaluating him under R.I. law - something its own policy proscribes. UPS 00494.

Nothing could evidence UPS's failure more clearly than when Collier explained the complete lack of investigation that led to the September 2003 rejection letter. Collier said that the regional UPS staff should have been the ones to determine reasonableness - but he never talked to them before rejecting Izzi's request. Collier 45-6. Collier did not perform any seniority or route analysis before rejecting Izzi's request. Collier 63-66. Instead, Collier said he relied on Souza and Murphy to "investigate the routes." Collier 63-4, 66. Souza and Murphy directly contradicted this - both said they were not involved in drafting the letter and did not investigate the routes.[30] Souza 57, 102-03, Murphy II 5, 9-11. Neither did Burke. Burke 15, 41. Souza was not sure if she even talked to Collier about Izzi. Souza 53-4. Murphy said that Collier would contact the IE department for the analysis - but this was never done. Collier 75-6, Poirier 75 Murphy II 11. No one ever even met with Izzi.

To this day, it does not appear as if UPS made any efforts to speak with current management who might be better able to assess if an accommodation could be made. For example, Persuitte, division manager, was never asked about the feasibility of Izzi's requests. He never talked to anyone in IE about a possible way Izzi could drive. 47-8. In fact, Persuitte did not even know that there are

[29]Ron Poirier shared this attitude, when asked if he felt that other drivers would perceive it as unfair for Izzi to drive a small vehicle, even if he qualified for an accommodation, Poirier responded "we're talking about delivering packages * * * not [] about people with severe handicaps, or wheelchairs * * *." When asked if they would feel differently if Izzi had a visible handicap, he said "I would." Poirier 83-4.

[30]When asked about efforts made after the Collier Letter, Murphy said he would not go through the effort to investigate routes because he assumes that he knows the size of vehicles presently assigned to routes. Murphy II, 18.

routes dispatched out of his own building in small vehicles every day. 39-41. Instead, he assumed that no such route existed. Persuitte 40-2, 49-54. Neither, Faidell, who specializes in shifting work amongst drivers, nor Poirier, who has a great depth of knowledge about the planning systems, were ever asked to determine if Izzi could be accommodated. Faidell 62, Poirier 89.

UPS's failures can be directly attributed to a lack of adequate training on the duty to engage in the interactive process and how to make accommodations. Faidell 62 (not trained), Burke 18, 20, 35 (not sure when you have to provide an accommodation), 38 (not sure what interactive process is), 69 (not sure what diabetes protocol is), Souza 33 (not sure what training says), Collier (not sure what diabetes or vision protocol provides). Burke 53-4, Poirier 80 (no training and does not know who handles requests), Persuitte 23 (no idea how to figure out if someone is entitled to accommodation).

It is this string of failures that has prevented Izzi from driving for the last nearly three years and which clearly constitutes a failure to interact.

**F. UPS DISCRIMINATED AGAINST IZZI BECAUSE OF HIS DIABETES.** UPS also argues that Izzi's discrimination claim fails because there is no evidence that Izzi was treated differently than other similarly-situated non-disabled employees. By relying on Raytheon v. Hernandez, 540 U.S. 44, 49 & n.3 (2003), UPS has missed the mark. Here, the burden-shifting framework of McDonnell-Douglas does not apply because there is direct evidence of discrimination. See Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 510 (2002). This change in the structure of proof results in a "pronounced advantage" to the plaintiff. See Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000); Weston-Smith v. Cooley Dickinson Hosp., 282 F.3d 60, 64-5 (1st Cir. 2002). In a direct evidence case,[31] once the plaintiff introduces direct evidence that disability was the reason for the adverse job action, the burden of persuasion shifts to the employer who must establish that it would have made the same decision without considering plaintiff's disability. Febres,

[31]Even it these facts were analyzed under McDonnell-Douglas, or even under the mixed-motive analysis of Price-Waterhouse, Izzi would still survive summary judgment.

214 F.3d at 60 (citing Price-Waterhouse v. Hopkins, 490 U.S. 228, 276-77 (1989)).

Direct evidence "consists of statements made by a decision maker that directly reflect the alleged animus and bear squarely on the contested employment decision." Febres, 214 F.3d at 60. Miranda told Izzi that he was being taken off the road because of his diabetes and Miranda admits, he was concerned about Izzi's ability to drive safely. SDF 15. This evidence reflects a discriminatory animus and bears directly on the adverse action, removing Izzi from his driving position.

UPS bears the burden of showing that it would have made the same decision in the absence of Izzi's diabetes. Febres, 214 F.3d at 60. UPS offers absolutely no evidence on this point. Even if it had, it would be easily rebutted. UPS could not rely on the lack of a DOT Card as a legitimate reason to remove Izzi from his driving position because UPS's own Diabetes Protocol specifically allows insulin-dependent UPS drivers who cannot get DOT Cards to continue to driving for UPS. In fact, UPS has over 100 other drivers who have lost their DOT Cards and have not been prohibited from driving. UPS Adm.2-5.

When an employer subjects a plaintiff to adverse action expressly because of his disability, the employer must show that it made due inquiry into the impairment sufficient to inform itself of those limitations, and that the results of that individualized inquiry furnished a reasonable foundation for the employer's belief that the plaintiff was not qualified to perform the job. See Gillen, 283 F.3d at 29. If the employer fails to do so, or it's reasons ultimately prove groundless, it will be liable under the ADA. See id.

**G. UPS'S PREEMPTION ARGUMENT FAILS.** UPS has alleged that if it allows Izzi to bid a cover route, only driving a small vehicle, it would be a "new" job under the CBA.[32] Assuming that Izzi disputes its interpretation of what a new job is under the contract, UPS argues the Court will

[32] UPS also argues that if the seniority provision is an "issue" then preemption applies. There is no dispute between the parties regarding the existence of the seniority system and the fact that a more senior employee can "outbid" a less senior employee. Thus, there is no "interpretive dispute" regarding seniority.

be required to interpret the CBA and is precluded from doing so by the doctrine of preemption. UPS Memo § C(ii)(b). This argument lacks merit for the following reasons.

First, as discussed supra, a cover driver limited to a small vehicle is not a new job (under any interpretation of the contract) because there are currently cover drivers who can only drive small vehicles and those jobs were not considered new by UPS. See supra. Second, assuming it were a new position (which requires no interpretation of the contract), there is no guarantee that anyone else would want the job. See supra. These reasons alone dispose of UPS's "preemption" argument.

Even if it they did not, preemption is applicable only in certain situations, not present here. The purpose of preemption is to (1) "retain consistency in the interpretation of terms common to CBAs and [2] prevent parties from relabeling as state law claims their actions that in actuality arise under a CBA." Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 10 (1st Cir. 1999) (citing Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985)). "The doctrine does not preclude all state law claims that are somehow linked to a labor dispute." Id. (citing Lingle v. Norge Div. of Magic Chef, 486 U.S. 399, 405-06 (1988)). There must be differing interpretations of the contract language which require the Court to conduct an analysis using the state law, which runs the risk of creating an inconsistency between the state law relied upon, and federal labor law. See Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997). This is nothing like Flibotte, or even Sarsycki, a case decided with virtually no analysis.

This is impossible here, because there is nothing in FEPA, RICRA, or RICRPHA that speaks to when a job is "new" under the CBA. Thus, there is no way for the Court to come up with an inconsistency between state law and federal labor law.[33] Thus, even if the Court chose to consult the

---

[33]Even so, UPS relies on Murphy's testimony to support it's argument that Izzi requests a new position. Murphy II 94. Murphy totally contradicts himself because he also said that a person who qualifies under the Diabetes Protocol and drives only small vehicles does not create a new job because they are bidding on an existing position. Murphy II 16. Since Izzi would be bidding into an existing position "building cover," no new job is being created. Murphy's first statement is also totally inconsistent with Reddy, the union business agent's, interpretation of the

CBA (which Izzi does not submit) "the bare fact that the [CBA] will be consulted in the course of the state law litigation plainly does not require the claim to be extinguished." Id..

Preemption in this case would also be contrary to public policy in support of state-law discrimination claims. See Fant v. New England Power Service Co., 239 F.3d 8, 15 n. 7 (1st Cir. 2001); see also Lueck, 471 U.S. at 210, 213 (noting that state-law rights and obligations that do not exist independently of private agreements, and that could be waived or altered by the agreement of the parties, are the type subject to preemption). These state law discrimination statutes exist totally independent of the CBA, and here, there is no chance of a conflict. Accordingly, UPS's argument must be rejected.

**V. CONCLUSION.** For the foregoing reasons, Izzi respectfully requests that UPS's Motion for Summary Judgment be denied. Izzi also respectfully requests oral argument.

Plaintiff,
By his Attorneys,

Carly Beauvais Iafrate, #6343
170 Westminster Street, #601
Providence, RI 02903
(401) 421-0966
(401) 351-4802 (fax)

## CERTIFICATION

I hereby certify that a copy of the within document to Lori Caron Silveira, Esq., and Timothy Bliss, Esq., Tillinghast, Licht, LLP, 10 Weybosset Street, Providence, RI 02903; Hugh F. Murray, III, Murtha Cullina LLP, City Place I, 185 Asylum St., 29th Floor, Hartford, CT 06103-3469; and Laurie Alexander-Krom, Esq., Murtha Cullina, LLP, 99 High Street, Boston, MA 02110 on the 15th day of August 2005.

---

30-day provision, who says that it only applies when a job becomes open because the person has left the route. Reddy 24-5.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ANTHONY D. IZZI,** | : | |
| **Plaintiff,** | : | **C.A. No. 04-321T** |
| **v.** | : | |
| **UNITED PARCEL SERVICE, INC.,** **Defendant.** | : | |

**AFFIDAVIT**

1. I was the UPS Warwick Division Manager from September 2002 to May 2004.

2. As a division manager, I was responsible for the day to day operations of the division which included all package car drivers, Anthony Izzi was a package car driver.

3. In October 2002, I found out that Anthony Izzi had diabetes.

4. I found out that because of his diabetes, Anthony Izzi could not get a DOT card from the UPS doctor.

5. Therefore, I was confident, due to some past experiences at UPS, that without a valid DOT card for any reason, Anthony Izzi would have to be moved to a full-time warehouse position as opposed to a full-time driving position.

6. My decision was based on, my understanding, of UPS policy and DOT regulations. On a personal note I had concerns regarding Anthony Izzi's well-being, the community he works in, and UPS.

7. I discussed the possibility that Anthony's condition could be dangerous and potential hazards could occur if Anthony were to drive, with the business agent, Kevin Reddy.

8. Anthony took the opportunity to speak to me about his situation whenever he saw me in the facility.

9. I personally did not look into whether it was feasible for Anthony to drive an under 10,001 pound vehicle

10. Prior to, approximately Sept. 2003, I had not received any factual documentation or instruction from UPS to amend my decision regarding Anthony's driving capacity.

11. At some point I was told that Anthony Izzi could drive an under 10,001 pound vehicle during peak season. I allowed him to do this during peak season 2003.

12. I recall Anthony filing a grievance about not being allowed to drive. I believed this grievance to be invalid due to conversations I had with Anthony's Business Agent, Kevin Reddy, and the DOT regulation addressing individuals with diabetes.

Signature

KENNETH J. MIRANDA
Print Name

6/22/05
Date

Subscribed and sworn to before me this 22 day of June 2005, in 2005 Harris Cty TX

City State

Notary Public
My Commission Expires: 10/14/08

ROBERT P. BRADSHAW
Notary Public, State of Texas
My Commission Expires
October 19, 2008

*Issue date - June 16, 19[illegible]*

# Diabetes Protocol

In the past, UPS has maintained a policy that if a driver failed any part of the D.O.T. physical, that driver would be prevented from operating a UPS vehicle. With the passage of the Americans with Disabilities Act (ADA), UPS took a closer look at that policy and is now implementing a new protocol that may allow certain D.O.T. disqualified drivers the opportunity to operate specific UPS vehicles.

Driver candidates with insulin-treated diabetes mellitus (ITDM) or visual impairments will be individually assessed upon request to determine their ability to safely operate UPS vehicles weighing 10,000 pounds or less. The following is a breakdown of the steps to be utilized:

1. The employee must have a driving record that would not otherwise disqualify him or her from a UPS driving position.

2. Once the employee's medical board certified physician has been provided with a complete and thorough written explanation of the specified UPS job requirements, it is the responsibility of that physician to document and approve, in writing, that it is safe for the employee to operate a motor vehicle for UPS. In addition, the employee's physician must agree to report to UPS any discrepancies that the employee exhibits that are in conflict with the reasonable accommodation guidelines. This includes, without limitation, noncompliance with the established treatment program or change in the employee's condition that may warrant removal from a driving position. Also, the employee's physician must certify that the employee has been thoroughly educated about his or her condition. For example: control, recognition and identification of problems.

3. The employee must agree to release pertinent medical records to a UPS consulting physician, and where necessary, a third doctor, in order that these physicians may, where necessary, conduct a thorough examination.

4. The employee must agree to periodic medical evaluations as defined in the protocol that are related specifically to the condition in question. This is in addition to the routine biennial D.O.T. physical. The frequency of these condition-related examinations may be adjusted by the UPS consulting physician after consideration and evaluation of employee safety and public safety issues.

5. Any necessary third doctor examinations or opinions will be rendered by a medical board certified physician in the specialty covering the medical condition in question. The decision rendered by that doctor will be final and binding as set forth in the collective bargaining agreement.

6. The employee's physician and the UPS consulting physician shall not be one and the same.

7. Any physician's evaluation involved in this accommodation process shall be conducted in accordance with the provisions of the medical evaluation worksheet furnished by UPS and enclosed in the attached binder.

This entire process is to be considered an individualized assessment of the employee's medical condition as it relates to a reasonable accommodation under the ADA or applicable state law. Because this is being considered a reasonable accommodation, all the rules applicable to the reasonable accommodation process apply in these cases.

As you encounter a situation in your region or district, an explanation to guide you through the reasonable accommodation protocol is attached. For more information regarding the reasonable accommodation protocol for D.O.T. disqualified drivers, contact Susan Pelchat ATLAS 4906677 or Matt Capozzoli at ATLAS 490-6681.

pc: without enclosures
Region and District Managers
Region and District Labor Relations Managers
Corporate Human Resources Coordinators
Corporate Labor Relations Coordinators
Corporate Health & Safety Managers
Region and District Health & Safety Managers
Region Medical Services Managers
District Medical Services Supervisors
Jack Kelley
Jim Kelly
Cal Tyler
Bud Yard

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ANTHONY D. IZZI, Plaintiff, v. UNITED PARCEL SERVICE, INC., Defendant. | C.A. No. 04-321T |

AFFIDAVIT

I, Robert J. Dobrzynksi, M.D., do hereby state and affirm that:

1. I am a doctor licensed to practice medicine in Rhode Island. I am board certified in Internal Medicine and Diabetes & Endocrinology.

2. I have been treating Anthony Izzi since 2001. Anthony has Type I diabetes mellitus. Diabetes is not a curable disease, but it is treatable.

3. Diabetes mellitus is a disorder of glucose metabolism. The pancreas of a person with Type I diabetes does not secrete sufficient insulin to control glucose like the average, non-diabetic person.

4. Some symptoms of diabetes mellitus are polydipsia (excessive thirst), polyphagia (excessive hunger and eating), and fatigue.

5. Type I diabetes is treated with insulin. This means that in order to treat his diabetes, Anthony must use insulin 2-3 times daily to control his glucose level.

6. If a Type I diabetic person does not take their medication properly, they can develop complications like blindness, heart disease, kidney disease and neuropathy. Ultimately, a person with untreated diabetes can become severely dehydrated and lose consciousness. Without insulin, a person with diabetes can develop diabetic ketoacidosis which can cause death.

7. If Anthony stopped taking insulin, as described above in paragraph 6, he would stop absorbing glucose, become ketotic, lapse into a coma and die of diabetic shock. At a minimum that would substantially limit his ability to function in any capacity, including walking, seeing, speaking and performing manual tasks.

8. I have reviewed the essential functions of the UPS package car driver position (attached to my affidavit as Exhibit A). In my medical opinion, there is no function listed in this document that Anthony cannot perform (and could not have performed since 2002).

9. Although UPS asked me for my medical opinion on Anthony's fitness for driving in the past, they never asked me what would happen to Anthony if he stopped using insulin.

10. In my opinion, there is no medical reason why UPS should prohibit Anthony from driving any UPS delivery vehicle. Anthony has not had any problems controlling his diabetes since I began treating him.

Subscribed and sworn to under the penalties of perjury this 11 day of August 2005.

Robert Dobrzynski MD
Robert J. Dobrzynski, M.D.

Subscribed and sworn before me this 11th day of August 2005.

Yvette B. Mace #53800
Notary Public

My Commission Expires: 8/20/08

EXHIBIT "A" TO DOBRZYNKI AFFIDAVIT

**Essential Job Functions For:**

Service Provider

Casual Service Provider

Driver Transfer

Feeder Driver Non-Tractor Trailer

Air Feeder (Non-Tractor Trailer)

**Overview:**

Involves driving a commercial motor vehicle. Must be able to deliver and pick up packages at a constant pace during a full work shift, working in accordance with prescribed methods and performance standards. Service Providers must meet all of the requirements as specified by the D.O.T.

**Essential Functions (must be able to):**

- Bend, stoop, crouch, climb, stand, sit, walk and turn/pivot for up to 9.5 hours per day, 5 days per week
- Extended hours may be required as service needs dictate
- Lift, lower, push, pull, leverage and manipulate equipment and/or packages up to 130 inches combined length and girth, and up to 48 inches long, and occasionally weighing up to 70 pounds, average weight of 12 pounds.
- Assist in moving up to 150 lbs.
- Lift packages to heights above the shoulder and lower packages to foot level.
- Operate standard transmission
- Reach, grasp, and maintain control of items and materials used to perform activities associated with delivering and picking up packages including operation of the Delivery Information Acquisition Device (DIAD) and the DIAD Vehicle Adapter (DVA).
- See, hear and communicate with sufficient capability to perform assigned tasks and maintain proper job safety conditions and communicate with the public.
- Maintain an acceptable work pace.
- Report to work on a regular and timely basis
- Work in an environment that will contain:

  - variable temperatures and humidity (climatic conditions)

- exposure to noise, dust/dirt

- confined work areas

- outside inclement weather

- Work cooperatively in a diverse work environment
- Demonstrate cognitive ability to:

  - follow directions and routines

  - work independently with appropriate judgment

  - exhibit spatial awareness

  - read words and numbers

  - concentrate, memorize, and recall

  - identify logical connections and determine sequence of response

  - process up to 2-3 steps ahead

- Perform other functions that may be assigned

***The essential functions of this job may vary greatly depending upon the size and location of the UPS facility. At some locations, employees may not perform all of the essential job functions listed above. At other locations, employees may perform some or all of the functions listed above and, in addition, may be required to perform other jobs or tasks as directed. In addition, given the nature of the business, UPS retains the right to modify the essential functions of this position at any time.***

[back to top]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **ANTHONY D. IZZI,** Plaintiff, v. **UNITED PARCEL SERVICE, INC., Defendant.** | **C.A. No. 04-321T** |

## AFFIDAVIT

I, Anthony D. Izzi, do hereby state and affirm that:

1. As I previously said in my Answers to Interrogatories, I realize that if I stop taking insulin, after my sugar rises, eventually, I believe I would lapse into a coma and ultimately die.

2. After UPS took me off my driving route, my pay was reduced during the week ending December 21, 2002, from $23.77 to $18.04 per hour.

3. When UPS asked me to drive during the Christmas peak season in 2003, I drove two different vehicles. I drove a sprinter or P47D and I also drove a P50, which looks like a regular package car but has only two wheels in the back.

4. During this time, Christmas peak season 2003, approximately 80 percent of the time I was delivering in Barrington. In addition, I also met other drivers with packages for their routes or so they could give me some packages for me to deliver. I also delivered some packages to Warren and Bristol.

5. During this time, sometimes after I did this Barrington route I would go to the "Mailbox, Etc." store in Barrington and do a pick up there.

6. There used to be a driver named Jim Whittaker. He told me that because of his bad back, UPS gave him a permanent route that no one could bid on. The route was made just for him and was lighter (it involved doing high value pick ups and a run to Logan Airport). After he died, I believe this route became biddable. I have talked to Chris Grogan about this. I think he bid it after Whittaker died. I also talked to Frank Medeiros about this. I think he bid this route after Chris Grogan.

7. My seniority date is September 5, 1996.

8. From the time I started driving at UPS, until October 2002, I drove as an air driver, fixed bid route driver, and cover driver. Over this approximately ten-year period I drove in a variety of areas, including Providence, East Providence, the East Bay and South County.

9. No matter what kind of driving I have done, whether as a cover driver or as a fixed route driver, the job is the same - it consists of delivering and picking up packages, and the functions associated with those two tasks. It is the same no matter what size vehicle I have driven and I have driven vehicles of all sizes (under 26,000 pounds).

10. When I drove during peak season 2003, I was a package car driver who basically drove the same route every day.

11. I have been keeping track of the days when small vehicles are not used. On nearly every day, there is at least one small vehicle not being used.

12. As far as I know, people who drive as air drivers as part of their 22.3 combo job, get paid approximately $2.00 per hour less (for the air driving component) than if they worked two inside part-time jobs like I do.

Subscribed and sworn to under the penalties of perjury this 15th day of August 2005.

Anthony D. Izzi

Anthony D. Izzi

Subscribed and sworn before me this 15th day of August 2005.

Notary Public

My Commission Expires:

CARLY B. IAFRATE
NOTARY PUBLIC
STATE OF RHODE ISLAND
My Commission Expires January 20, 2008

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ANTHONY D. IZZI,
Plaintiff,
v.
UNITED PARCEL SERVICE, INC.,
Defendant.

C.A. No. 04-321T

## AFFIDAVIT

I, William J. Piccerelli, CPA, do hereby state and affirm that:

1. I am licensed Certified Public Accountant and partner in the firm, Piccerelli, Gilstein & Company, LLP, 144 Westminster St., Providence, RI 02903.

2. At the request of the Plaintiff in this case, I reviewed UPS documents which contained data on package car vehicle usage. These documents are UPS Document Nos.000647-00700, 00778-00809, 00621-00630, 00745-00777, 000364-000373. I also referred to the 2005 Bid document and Seniority List provided by UPS.

3. Calculations were made using only the information for the weekdays, Monday through Friday, starting with Monday March 15, 2004.

4. Cover drivers were listed on the Bid document. Using the data provided for Cover drivers who drove certain small vehicles (P32s, P47Ds, and P50s), calculations were made to determine how often Cover drivers were driving these small vehicles.

5. The results show that during 365 consecutive weekdays (Monday through Friday) starting with Monday, March 15, 2004, Cover drivers drove these small vehicles approximately 465 times. Taking out the days that more than one Cover driver drove a small vehicle on the same day, there were approximately 294 days where a Cover driver drove a small vehicle.

6. Sorting these results by seniority, there were approximately 263 days where a small vehicle was driven by a Cover driver with a seniority date later than September 5, 1996. This represents 73.9% of the 365 available days.

Subscribed and sworn to under the penalties of perjury this 15th day of August 2005.

William J. Piccerelli, CPA

Subscribed and sworn before me this 15th day of August 2005.

Notary Public

My Commission Expires: 1/12/06

1045 University Ave., Norwood, MA 02062
(781) 551-2400

9/29/03

Mr. Anthony Izzi
27 Chicory Lane
Cranston, RI 02901

Dear Anthony:

Over the last several weeks UPS has carefully evaluated your request for a job-related accommodation with regard to your diabetes. It appears that under the federal Americans with Disabilities Act, your condition does not rise to the level of a "disability." Rhode Island state law is somewhat broader, but federal regulations currently prohibit an individual with your condition from operating a commercial motor vehicle with a gross vehicle weight of more than 10,000 pounds. At this point, therefore, we cannot allow you to drive most of the UPS delivery vehicle.

Fortunately, there are two alternatives that are potentially available to you that may allow you to return to driving for UPS.

First, we evaluated you under the United Parcel Service Diabetes Protocol and have determined that you do qualify to operate vehicles under 10,001 pounds gross vehicle weight. As you may be aware, such vehicles are placed on certain routes based on a number of operational factors including delivery and P/U volume. Currently in your facility there are three routes that require such a vehicle. As you know, routes are awarded by seniority in the annual bid process in accordance with the collective bargaining agreement between UPS and the Teamsters union. Currently the least senior employee on the three routes with the smaller vehicles has a seniority date of 5/12/86. As you know, your seniority date is 9/5/96.

When the next annual bid takes place, you will be eligible to bid appropriate routes. If you are interested at bidding time, contact Human Resources, which will assist you in identifying routes meeting your needs. If you are able to bid one of those routes, contact Julie Souza, the Occupational Health Supervisor, at (781)551-2508 as she will need to continue to get medical information required under the Diabetes Protocol.

Second, the Federal Motor Carrier Safety Administration ("FMCSA") has recently approved an exemption process for individuals with Insulin Treated Diabetes Mellitus. The process requires a relatively extensive application to be submitted, with supporting documentation, to the FMCSA. That agency has begun accepting applications on September 22, 2003. If approved, you would then be allowed to drive full size vehicles. We do not know how long the approval process will take, but it is

1045 University Ave., Norwood, MA 02062
(781) 551-2400

certainly possible that an exemption could be granted in time for you to participate in the 2004 annual bid. We would be glad to assist you in such an application. If you are interested, please contact Julie Souza at (781)551-2508.

If you have any questions please call me at (781)551-2412.

Sincerely,

Steven Collier

Steven Collier
District Human Resource Manager

**ANSWER:**

On or about October 28, 2002, Ken Town sent me a message on my "diad" board telling me something like Bob Burke or someone else from Human Resources or the Norwood UPS office told him to tell me that I had to go see the UPS doctor the following day or I would not be allowed to drive anymore.

**INTERROGATORY NO. 9**

Describe in detail each and every occurrence in which "Defendant requested plaintiff to drive a truck" as alleged in paragraph 20 of the Complaint, including but not limited to describing the type and size of the truck at issue.

**ANSWER:**

In December 2003, I was asked to drive a truck for about a month. I drove two different vehicles, a van or "sprinter," and a package car that I believed weighed less than 10,001 pounds.

**INTERROGATORY NO. 10:**

Identify each and every major life activity that your diabetes substantially limits.

**ANSWER:**

Because I would die if my diabetes was in an unmitigated state, it is impossible to state each and every major life activity that my diabetes substantially limits. However, at a minimum, in its unmitigated state, it substantially limits the major life activities of breathing, walking, seeing, hearing, speaking, and performing manual tasks.

Anthony D. Izzi

Subscribed and sworn to before me this 17th day of September 2004, in Providence, Rhode Island.

Carly Beauvais Iafrate
Notary Public
My Commission Expires

CARLY B. IAFRATE
NOTARY PUBLIC
STATE OF RHODE ISLAND
My Commission Expires January 26, 2008

**RI Bid Route Drivers Car Use**

| Last | Date of Employment | First | Type | Max Wgt | # Days | % of Days |
|---|---|---|---|---|---|---|
| BRIGIDA | 6/7/1976 | M | P50 | 9000 | 168 | 96% |
| BRIGIDA | | M | P50 | 11000 | 7 | 4% |
| | | | | | 175 | |
| | | | | | | |
| CHIN | 3/29/1978 | J | P50 | 9000 | 157 | 95% |
| CHIN | | J | P50 | 11000 | 8 | 5% |
| CHIN | | J | P70D | 16000 | 1 | 1% |
| | | | | | 166 | |
| | | | | | | |
| COOGAN | 5/26/1998 | G | P50 | 9000 | 34 | 18% |
| COOGAN | | G | P50 | 11000 | 1 | 1% |
| COOGAN | | G | P70D | 14000 | 98 | 51% |
| COOGAN | | G | P70D | 14500 | 4 | 2% |
| COOGAN | | G | P70D | 16000 | 53 | 28% |
| COOGAN | | G | P100D | 18000 | 1 | 1% |
| | | | | | 191 | |
| | | | | | | |
| GIBBONS | 4/13/1984 | T | P50 | 9000 | 63 | 65% |
| GIBBONS | | T | P50 | 11000 | 1 | 1% |
| GIBBONS | | T | P70D | 14000 | 1 | 1% |
| GIBBONS | | T | P100D | 18000 | 32 | 33% |
| | | | | | 97 | |
| | | | | | | |
| GYRA | 4/21/1986 | W | P32 | 8000 | 113 | 61% |
| GYRA | | W | P47D | 8550 | 8 | 4% |
| GYRA | | W | P70D | 14000 | 55 | 30% |
| GYRA | | W | P80 | 16000 | 9 | 5% |
| | | | | | 185 | |
| | | | | | | |
| HAND | 4/3/1978 | S | P32 | 8600 | 1 | 1% |
| HAND | | S | P50 | 9000 | 128 | 70% |
| HAND | | S | P70D | 16000 | 53 | 29% |
| | | | | | 182 | |
| | | | | | | |
| MEDEIROS | 6/22/1970 | F | P32 | 8000 | 166 | 91% |
| MEDEIROS | | F | P47D | 8550 | 15 | 8% |
| MEDEIROS | | F | P60 | 15000 | 1 | 1% |
| | | | | | 182 | |
| | | | | | | |
| TATE | 2/26/1980 | R | P47D | 8550 | 168 | 96% |
| TATE | | R | P50 | 9000 | 5 | 3% |
| TATE | | R | P50 | 11000 | 1 | 1% |
| TATE | | R | P80 | 16000 | 1 | 1% |
| | | | | | 175 | |

Izzi 9/5/1996

**United Parcel Service**
**East New England District**
***Annual Bid - 2005***

**Local 251**

**Manager: John Ronan**

| Job Number | Route ID | Job Classification | Start Time | Job Description | Presently Held By | Seniority Date | Filled By Name | Seniority Date |
|---|---|---|---|---|---|---|---|---|
| 88 | 16A | Pkg. Driver | 8:45 | Providence - Union Ave. | Hewitt, W | 9/5/1996 | Torres, L. | 05/29/01 |
| 89 | 16B | Pkg. Driver | 8:45 | Providence - Broadway | Triangolo, J | 4/16/2004 | Sharpe, R | 06/19/03 |
| 90 | 16C | Pkg. Driver | 8:45 | Providence - Atwells Ave. | Arnold, T | 7/10/2001 | Medici | 06/11/01 |
| 91 | 16D | Pkg. Driver | 8:45 | Providence - Dorrance St. | Karbowski, E | 4/1/1987 | McKenzie, G. | 02/15/01 |
| 92 | 16E | Pkg. Driver | 8:45 | Providence - Kennedy Plz | Ward, J | 5/11/1992 | Mazzulla, W. | 09/01/00 |
| 93 | 16F | Pkg. Driver | 8:45 | Providence - Westminster St. | Larkin, P | 9/26/1994 | Larkin, P | 9/26/1994 |
| 94 | 17A | Pkg. Driver | 8:30 | Providence - Niantic Ave. | Benzo, T | 2/15/1990 | McElroy, J. | 01/09/89 |
| 95 | 18A | Pkg. Driver | 8:45 | Providence - Allens Ave. | Carr, B | 1/24/1994 | Carr, B | 1/24/1994 |
| 96 | 18B | Pkg. Driver | 8:45 | Providence - Narragansett Ave. | Woodbury, K | 5/10/1994 | Woodbury, K | 5/10/1994 |
| 97 | 18C | Pkg. Driver | 8:45 | Providence - Broads St. | Adams, R | 2/15/2001 | Adams, R | 2/15/2001 |
| 98 | 18D | Pkg. Driver | 8:45 | Providence - Elmwood Ave. | Johnson, M | 9/1/1999 | Johnson, M | 9/1/1999 |
| 99 | 18E | Pkg. Driver | 8:45 | Providence - Broad St. | Palumbo, S | 1/24/1994 | Palumbo, S | 1/24/1994 |
| 100 | 19A | Pkg. Driver | 8:45 | Providence - Eddy St. | Roberts, B | 2/22/1994 | Ogle, R | 07/10/01 |
| 101 | 19B | Pkg. Driver | 8:45 | Providence - Richmond St. | Magnone, K | 1/24/1990 | Magnone, K | 1/24/1990 |
| 102 | 20A | Pkg. Driver | 8:45 | Providence - South Main St. | Wojtowicz, C | 2/14/1994 | Wojtowicz, C | 2/14/1994 |
| 103 | 20B | Pkg. Driver | 9:00 | Providence - Thayer St. | Bonner, J | 3/22/2000 | Costa, J | 06/03/02 |
| 104 | 20C | Pkg. Driver | 8:45 | Providence - Waterman St. | D'Amato, R | 4/28/1996 | D'Amato, R | 4/28/1996 |
| 105 | 20D | Pkg. Driver | 8:45 | Providence - Prospect St. | Sands, M | 1/24/1990 | Sands, M | 1/24/1990 |
| 106 | 20E | Pkg. Driver | 8:45 | Providence - North Main St. | Williams, D | 8/28/1995 | Williams, D | 8/28/1995 |
| 107 | 20F | Pkg. Driver | 8:45 | Providence - Angell St. | Souza, D | 5/22/1972 | Nascimento, M. | 07/11/95 |
| 108 | 20G | Pkg. Driver | 8:45 | Providence - Hope St. | Nascimento, M | 7/11/1995 | Duarte, L. | 01/30/01 |
| 109 | 21A | Pkg. Driver | 8:45 | Pawtucket - Central Ave. | Simbron, D | 9/19/1999 | Simbron, D | 9/19/1999 |
| 110 | 21B | Pkg. Driver | 8:45 | Pawtucket - Armistice Blvd. | Salvatore, T | 6/3/1999 | Salvatore, T | 6/3/1999 |
| 111 | 21C | Pkg. Driver | 8:45 | Pawtucket - Narragansett Park Dr. | Fagundes, M | 8/15/1994 | Fagundes, M | 8/15/1994 |
| 112 | 21D | Pkg. Driver | 8:45 | Pawtucket - School St. | Hirschegger, K | 9/5/1996 | Hirschegger, K | 9/5/1996 |
| 113 | 21E | Pkg. Driver | 8:45 | Pawtucket - Prospect St. | Sutcliffe, J | 5/21/2001 | Bousquet | 05/21/01 |
| 114 | 22A | Pkg. Driver | 8:45 | Pawtucket - Broadway | Mcimail, S | 3/29/1994 | Garcia, M | 9/1/2000 |
| 115 | 22B | Pkg. Driver | 8:45 | Pawtucket - Main St. | Merolla, A | 9/27/1990 | Merolla, A | 9/27/1990 |
| 116 | 22C | Pkg. Driver | 8:45 | Pawtucket - Pawtucket Ave. | Ogle, R | 7/10/2001 | Bigalow | 09/01/02 |
| 117 | 23A | Pkg. Driver | 8:45 | Providence - Providence Pl. | DaRosa, K | 4/5/2004 | Dorsey, J. | 10/08/87 |
| 118 | 23B | Pkg. Driver | 8:45 | Providence - Providence Pl. | Baril, P | 1/31/1990 | Mann | 06/07/99 |
| 119 | Cover | Pkg. Driver | 8:45 | Building Cover | | | Mederios, F | 06/22/70 |
| 120 | Cover | Pkg. Driver | 8:45 | Building Cover | | | Bonner | 03/22/00 |
| 121 | Cover | Pkg. Driver | 8:45 | Building Cover | | | Seifert | 09/01/00 |
| 122 | Cover | Pkg. Driver | 8:45 | Building Cover | | | Harrington | 05/07/01 |
| 123 | Cover | Pkg. Driver | 8:45 | Building Cover | | | Slade | 03/30/04 |

**All bidders must be properly licensed and qualified

UPS 00609

A. I would say yes.
Q. Do you know who that person was in 2003?
A. I believe it was being run by Al Jonski.
Q. So do you know for a fact whether Al looked at Anthony Izzi's first choice and determined whether an under 10,000-pound vehicle was being utilized on that route?
A. I do not know for a fact.
Q. Do you know whether he determined whether an under 10,000-pound vehicle could have been used on that route?
A. I do not know.
Q. And do you know that for any of Anthony Izzi's driving choices?
A. No, I do not.
Q. And so do you have any reason to believe that Anthony Izzi would have put down choices for which he didn't have enough seniority?
A. No, I do not have any reason to believe.
(PLAINTIFF'S EXHIBIT 13 MARKED FOR ID)
Q. Looking at this document which is Anthony Izzi's 2004 bid sheet, do you know if anybody determined for his first three choices, which are all driving positions, whether any of those positions could be had using an under



10,000-pound vehicle?
A. I do not know.
Q. You personally never made that determination?
A. That's correct.
Q. Do you know about the 2005 bid. I don't have the document, but do you know if anybody made the determination of whether his choices could be had using an under 10,000-pound vehicle?
A. I do not.
Q. But when he actually goes into the bid and looks at what's available, and I think we talked about this last time, it doesn't actually indicate on the sheet what type of a vehicle is used on that route?
A. That's correct.
Q. The only way he would know is going out and trying to figure out what vehicle is using what?
A. That's correct.
(PLAINTIFF'S EXHIBITS 14-15 MARKED FOR ID)
Q. These are two documents that were provided by UPS in discovery and they both are entitled. "Essential job functions."
MS. ALEXANDER-KROM: Objection.
MS. BEAUVAIS-IAFRATE: Essential job functions for. I don't know how I would



have gotten this other one, though.
Q. Let's look first at 14. This one was definitely provided to me by UPS. And it says, "Essential job functions for: Service providers." So this would apply to the package car driver position?
A. That's correct. The appropriate term for package car driver is a service driver.
Q. Do you know if UPS disputes that Anthony can perform any of the essential functions which are listed sort of halfway down. It says, "Essential functions (must be able to)" and then there's a list.
MS. ALEXANDER-KROM: Objection. Are you asking for his understanding?
MS. BEAUVAIS-IAFRATE: I'm just asking if he knows if there's a dispute.
A. Not to my knowledge.
Q. To your knowledge Anthony wouldn't have a problem doing any of those things?
A. Not to my knowledge.
Q. It does say under the overview part, "Service providers must meet all the requirements as specified by the DOT"
A. That's correct.
Q. Would you consider that to be an essential



function of the job?
A. Absolutely.
Q. Even if it's not under essential function?
A. Yes. Essential job functions are determined for physical capability evaluations and/or requirement. It's still an essential function of the job to be able to be qualified to drive. Just like you have to have a qualified license, you have to meet the DOT qualifications. You have to be able to drive a standard shift. They're all essential to the job.
Q. But doesn't that conflict with the diabetes protocol because in that situation the person would not have to be DOT qualified?
A. No. It says DOT requirements. And DOT does not require you to have a -- you're within the DOT requirements if you're driving a vehicle under 10,000 pounds.
Q. So you're saying you can be a package car driver and drive an under 10,000-pound vehicle and still be performing the essential functions?
A. Sure.
Q. Now, looking at 15. It looks like essentially the same document, but maybe it's older. It says package car driver on the top.

Page 14

couldn't get a DOT card. As you notice in that first page, and it speaks specifically -- it says driver candidates with insulin-related diabetes. It was to prevent the exclusion of people who were not yet drivers who wanted to become even air drivers or part of an air driving combo job, because that would be very applicable with the under 10,000-pound vehicles. That was the original impetus of this development of the protocol.
Q. So despite it being the original impetus though, do you dispute that it's used for any person who might be DOT disqualified even if they're already a driver?
A. It's used as a determining factor to see whether or not they could drive an under 10,000-pound vehicle, yes.
Q. So you're saying that you're not aware of anybody who's actually passed the protocol and does drive an under 10,000-pound vehicle?
A. No.
Q. You don't have any -- strike that. Do you think that UPS would have designed this protocol if it determined that there was no way it could employ someone who could only drive an under

Page 15

10,000-pound vehicle?
MS. ALEXANDER-KROM: Objection to the form.
A. I think they would have developed it for the purposes they developed it to ensure that our part-timers -- I'll explain. We have a history and a commitment giving opportunities to our part-time employees for additional earnings, and the original intent was to identify what they could do. I think I talked to you earlier about the fact that we focus on the ability, not the disability. That was the intent. If their thought process at the time was this isn't going to help us get a driver on the road to be an overall driver, but it's going to give us the opportunity to place people in air driving positions or allow someone to do a combo job, which would be a full-time opportunity, then I think they would have done it anyway.
Q. If they didn't think it was going to help keep a driver driving, then why would they put someone like Anthony Izzi through the procedure?
A. In the event that he would have the seniority to bid a route that was assigned that vehicle and/or to allow him to continue to drive

Page 16

in a combo driving situation.
Q. Somebody who continues to drive after they go through the diabetes protocol you would still call that person the package car driver, right?
A. Again, yes. If they had the seniority to bid, yes, they would still be a package car driver.
Q. You wouldn't consider that to be a new job?
A. No. They would be bidding an existing job.
Q. Do you know if Anthony Izzi had enough seniority to be a cover driver in 2002?
A. I don't know that definitively.
Q. Did you ever seek to find out what his seniority date was and determine whether he had more seniority than any cover drivers?
A. I did check to see what his seniority date was, because we were looking at what routes he might be able to bid. I never got into the cover driver situation.
Q. So when you say what routes he might be able to bid, you're talking about fixed routes?
A. Yes. Fixed routes.
MS. BEAUVAIS-IAFRATE: We'll mark this one next.
(PLAINTIFF'S EXHIBIT 11 MARKED FOR ID)

Page 17

Q. I'm going to show you a document from the 2003 bid. I'm going to direct your attention to Page 94. About halfway down there it says, "A. Izzi" and then there's a seniority date next to it. With that in mind, going back to Page 2 of the document, about halfway down it says, "Route 48, Seekonk-Highland Avenue cover"?
A. Yes.
Q. And it says, "Presently held by." Would that be the person who in 2002 was on that route?
A. That would be correct.
Q. That's an M. Pilloni?
A. Yes.
Q. Do you happen to know him?
A. I do not.
Q. Do you see what his or her seniority date is there?
A. I do. 4/16/98.
Q. Wouldn't Anthony have more seniority than Mr. Or Mrs. Pilloni?
A. Yes, he would.
Q. Do you have any idea what type of vehicle was assigned to Route 48, Seekonk, Highland cover in 2002?
A. I can't speak to 2002 and say that I can

they denied your grievance." Do you know who in the company informed you of that?

A. Ken Miranda.

Q. What did Ken tell you about that?

A. He said, "We can't let him drive the truck where he's insulin dependent." He said, "Why won't his doctor release him?" If he comes in with a DOT card --

MR. GURSKY: Is this what Miranda said?

A. This is what Miranda said. "We cannot let him drive the truck when he's insulin dependent. Would you want him out there driving the truck where something happened to him?" I said, "No, God forbid." We had a couple of other older drivers, they were forced inside. They're much longer. That is with every truck and company we have under contract. I don't know what some non-union company is doing that would let anyone drive. All of our companies don't allow anyone to drive that are insulin dependent.

Q. You said something about if his doctor released him?

A. If his doctor had signed his DOT card who would have known. His own doctor wouldn't sign his DOT card. He went back to his doctor after he went to UPS's and tried to get his doctor to say that it was