UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANTHONY D. IZZI | : | |
| | : | |
| v. | : | C.A. No. 04-321S |
| | : | |
| UNITED PARCEL SERVICE, INC. | : | |

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

**Background**

Before this Court is Defendant's Motion for Summary Judgment (Document No. 43) filed pursuant to Fed. R. Civ. P. 56. Plaintiff Anthony Izzi ("Plaintiff") alleges six counts of employment discrimination (disparate treatment and failure to accommodate) on the basis of disability under Rhode Island statutory law. Plaintiff alleges violations of the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1 et seq.; the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1 et seq.; and the Rhode Island Civil Rights of People with Disabilities Act, R.I. Gen. Laws § 42-87-1 et seq. ("RICRPDA"). Plaintiff's Complaint was originally filed in Rhode Island Superior Court and contained ten counts. Plaintiff's count alleging intentional infliction of emotional distress, (Count Ten), has been dismissed by stipulation, and it appears from the parties' memoranda that Plaintiff's three disparate impact discrimination counts, (Counts Four, Five and Six), have also been abandoned. Defendant United Parcel Service, Inc. ("UPS") timely removed to this Court on July 28, 2004 on diversity grounds. 28 U.S.C. § 1332.

UPS submitted its Motion for Summary Judgment and Memorandum of Law (Document No. 43) on July 29, 2005. Plaintiff objected to UPS's Motion and submitted his Memorandum of Law (Document No. 49) on August 15, 2005. This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local Rule of Court 32(c). A hearing was held on September 23, 2005. After reviewing the Memoranda submitted, listening to the arguments of counsel and conducting my own independent research, I recommend that UPS's Motion for Summary Judgment (Document No. 43) be GRANTED in part and DENIED in part.

**Statement of Facts**

Plaintiff commenced employment with UPS in 1989 and remains employed today. During the entire time of Plaintiff's employment with UPS, he has been represented, for purposes of collective bargaining, by Local 251 of the International Brotherhood of Teamsters (the "Union"). The Union and UPS have entered into a collective bargaining agreement ("CBA") that provides, in part, for the assignment of positions within the bargaining unit on the basis of seniority.

By 1996, Plaintiff had attained the position of full-time package car driver ("driver") for UPS. Plaintiff's seniority date as a driver is September 5, 1996. Plaintiff's job as a driver involved operating one of UPS's familiar brown trucks along various routes throughout Rhode Island. Routes are distributed to drivers through an annual bid system by which drivers bid on available routes on the basis of their seniority. Drivers may choose either a fixed route, if they have sufficient seniority, or may become a cover driver.

The great majority of UPS's package cars in Rhode Island are more than 10,000 pounds gross vehicle weight ("GVW"). The United States Department of Transportation ("USDOT") requires that

drivers of commercial motor vehicles over 10,000 pounds meet certain standards and have a certification ("DOT Card") to that effect. DOT Cards are renewable every two years. Plaintiff's last valid DOT Card was issued in October of 2000.

Plaintiff has Type I diabetes mellitus, which is not curable, but is treatable with insulin.[1] Between October of 2000 and October of 2002, Plaintiff's diabetes began to be treated with insulin. USDOT regulations require that in order to obtain a DOT Card, a driver must have "no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control." 49 C.F.R. § 391.41(b)(3). Plaintiff, therefore, has been unable to renew his DOT Card and does not possess one today. Thus, he may not lawfully operate UPS vehicles exceeding 10,000 pounds GVW.

UPS removed Plaintiff from his driver position in October of 2002. Ultimately, Plaintiff moved to an inside package loading position. Plaintiff's shift changed from first-shift days to third-shift nights. Plaintiff's hourly pay rate was reduced in late 2002 from $23.77 to $18.04 because of the change in job duties, and he continues to be paid at an hourly rate lower than he would be receiving as a driver.

Because UPS has some vehicles under 10,000 pounds GVW, it developed a "Diabetes Protocol" to individually assess whether a driver with insulin-treated diabetes mellitus, such as Plaintiff, may safely operate UPS vehicles weighing 10,000 pounds or less GVW. Pl's Ex. B.

---

[1] UPS initially argued that summary judgment was warranted because Plaintiff could not prove he was disabled under Rhode Island law. Although there may be a legitimate question about whether Plaintiff is disabled under the federal Americans with Disabilities Act ("ADA"), see Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), this is not the case under Rhode Island law which generally assesses the existence of a disability without regard to the availability or use of mitigating measures such as medications, i.e., insulin. See R.I. Gen. Laws §§ 28-5-6(4) and 42-87-1(1). In its Reply, UPS wisely withdrew its weak and hypertechnical argument as to disability status and now concedes, for these purposes, that Plaintiff is disabled under Rhode Island law.

UPS's protocol states that such assessment is to be considered part of the "reasonable accommodation process" required "under the ADA or applicable state law." Id. The protocol was originally distributed nationally in 1995 to UPS management. See EEOC v. United Parcel Serv., Inc., 149 F. Supp. 2d 1115, 1134 (N.D. Cal. 2000).

After a lengthy delay and only after Plaintiff filed an administrative charge of disability discrimination against UPS in May of 2003, UPS applied the Diabetes Protocol to Plaintiff and determined that he was qualified to operate UPS vehicles under 10,001 pounds GVW. Plaintiff was ultimately advised of UPS's determination by letter dated September 29, 2003 from Mr. Steven Collier, UPS's District Human Resource Manager. This letter came nearly one year after Plaintiff was originally removed entirely from driving duties. Plaintiff was advised in the letter that there were "two alternatives...potentially available to [him] that may allow [him] to return to driving for UPS." The first alternative was to bid for a route that uses an under 10,001-pound vehicle. Plaintiff was informed that there were only three such routes currently operating out of his assigned facility, and they were all held by drivers with substantially more seniority than Plaintiff. The parties agree that these routes are desirable and are attractive to high-seniority drivers. The second alternative was to seek a USDOT exemption from the regulatory prohibition against driving vehicles exceeding 10,000 pounds GVW. Plaintiff did not qualify, and his exemption application was denied on March 25, 2004.

During the holiday "peak" season in 2003, Plaintiff was asked to temporarily drive for UPS. He utilized two vehicles – a P47D (8,550 pound GVW) and a P50. UPS has both large (approximately 11,000 pound GVW) and small (approximately 9,000 pound GVW) P50 trucks.

UPS's counsel clarified at the hearing that UPS operates both large and small P50's nationally but that the P50's in Rhode Island are either "exclusively or almost exclusively" the larger P50's. Plaintiff asserts in his Affidavit at ¶ 3 that he drove a P50 during the 2003 holiday "peak" season. See also Aff. of Kenneth Miranda at ¶ 11. For purposes of this Motion, the Court will assume that Plaintiff operated a P50 during this time period and that the P50 driven by Plaintiff was a "small" one which he could lawfully drive. At that time, Plaintiff asserts that he delivered in Barrington 80% of the time as well as in Warren and Bristol, and, on occasion, made a pickup at the "Mailboxes, Etc." store in Barrington after making his deliveries. Aff. of Izzi at ¶¶ 4-5.

**Summary Judgment Standard**

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at

960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2514-2515, 91 L. Ed. 2d 202, (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve...." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

**A. Federal Preemption**

UPS argues that Plaintiff's state law discrimination claims are preempted by federal labor law because they relate to seniority provisions contained in the CBA. In particular, UPS contends that federal preemption is triggered by the necessity of interpreting the CBA in assessing the

reasonableness of Plaintiff's proposed accommodations and the existence of any hardship on UPS.[2] Plaintiff contends that UPS's preemption argument fails because the issues presented in this case could not create an "inconsistency between state law and federal labor law." In particular, Plaintiff's counsel argued that any conflict or inconsistency was "totally impossible" since there is no state law on what is a new job for bidding purposes. Although this Court agrees that UPS's preemption argument fails, it does not do so for all of the reasons argued by Plaintiff which are not entirely consistent with existing First Circuit preemption precedent.

Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, provides for federal question jurisdiction in "[s]uits for violations of contracts between an employer and a labor organization...." It says nothing about the preemption of any state statutory or common law actions. Subsequent to its enactment, the Supreme Court held that Section 301 implicitly "authorizes federal courts to fashion a body of federal law for the enforcement of...collective bargaining agreements...." Textile Workers v. Lincoln Mills, 353 U.S. 448, 451 (1957). This authority to develop a body of federal common law lead to the development of Section 301 preemption.

In Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 103 (1962), the Supreme Court held that state law is displaced when courts are "called upon to enforce" CBAs, because they should be consistently interpreted pursuant to federal common law and not based on varying state contract laws. Subsequently, the Supreme Court held that Section 301 preemption was not, however, limited

---

[2] UPS's counsel conceded at oral argument that this Court would not be precluded by Section 301 preemption from examining the CBA if Plaintiff's disability discrimination claims were brought under the federal ADA rather than Rhode Island law. See Morton v. United Parcel Serv., Inc., 272 F.3d 1249 (9th Cir. 2001) (CBA examined in context of ADA suit brought by a hearing-impaired driver); EEOC, 149 F. Supp. 2d at 1115 (CBA examined in context of ADA suit brought on behalf of a vision-impaired driver).

to "[state law] suits alleging contract violations." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 210 (1985).

Although the First Circuit has described Section 301 preemption as "cast[ing] a relatively wide net," it has recognized the existence of limitations on this rule. Flibotte v. Penn. Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997). For instance, "purely factual questions about an employee's conduct or an employer's conduct and motives do not require a court to interpret any term of a collective-bargaining agreement." Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 261 (1994). (citation omitted). Further, Section 301 "cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law...." Livadas v. Bradshaw, 512 U.S. 107, 123 (1994). Finally, it has been held that "defensive reliance on the terms of the CBA, mere consultation of the CBA's terms, or a speculative reliance on the CBA will not suffice to preempt a state law claim." Humble v. Boeing Co., 305 F.3d 1004, 1008 (9th Cir. 2002).

Section 301 preempts a state-law claim "if the resolution of [that] claim depends upon the meaning" of a contract covered by Section 301, such as a CBA. Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-6 (1988). In the First Circuit, a state law claim can "depend" on the meaning of a CBA in two ways. Flibotte, 131 F.3d at 26. A claim may depend on a CBA (1) because "it alleges conduct that arguably constitutes a breach of a duty that arises pursuant to" such contract or (2) because "its resolution arguably hinges upon an interpretation of" such contract. Id. (citing United Steelworkers of Am. v. Rawson, 495 U.S. 362, 369 (1990); and Allis-Chalmers, 471 U.S. at 220). If a state law claim depends on the meaning of a CBA in either of these two ways, it is

preempted by Section 301. In this case, Defendant relies on the "interpretation" and not the "duty" prong of the preemption test.

At this stage, the Court cannot say as a matter of law that resolution of Plaintiff's disability discrimination claims "hinges upon" the interpretation of UPS's CBA. In support of its Motion, UPS provides this Court with only two pages (167 and 168) out of the lengthy CBA between UPS and the Union, which deal solely with the issue of job bidding and seniority. Def.'s Ex. F. With the exception of one minor qualification, see Pl.'s Statement of Disputed Facts ("SDF"), ¶ 2, Plaintiff uniformly agrees with UPS's statements about the meaning of these provisions of the CBA.

For instance, Plaintiff agrees that both fixed and cover package car routes are awarded by seniority during an annual bid. Def.'s Statement of Undisputed Facts ("SUF"), ¶¶ 3, 5 and 15. Plaintiff also agrees that under the CBA, if a route changes by more than 50%, it becomes a new route, subject to bid as a "permanent job" after thirty days. Id., ¶ 16. Although the parties have not provided the Court with any supporting provisions of the CBA, they also do not dispute that UPS has the management right to assign any size and type of vehicle to a driver. See EEOC, 149 F. Supp. 2d at 1126 ("UPS can change the equipment assigned to a route without the union's consent."). Since the parties do not dispute the meaning of the CBA, the resolution of Plaintiff's state law disability discrimination claims would not require this Court to examine and resolve any competing interpretations. In other words, it appears at this stage that the resolution of Plaintiff's claims "hinges upon" this Court's interpretation of UPS's legal obligations as an employer under Rhode Island statutory law and not on the interpretation of a CBA.

UPS devotes a total of only one page in its Memorandum to its federal preemption argument. UPS does not cite to any case law in which a court has held that a state law disability discrimination was preempted by Section 301. UPS also does not cite to any case law applying Section 301 preemption in the context of a state law disability discrimination claim. This Court's research, however, has uncovered cases contrary to UPS's position. See, e.g., Jimeno v. Mobil Oil Corp., 66 F.3d 1514 (9th Cir. 1995) (state law disability discrimination claim not preempted by Section 301). In addition, UPS has been involved in past litigation which involved examination of its CBA in the context of both ADA and state law disability discrimination claims. See, e.g., Bates v. United Parcel Serv., Inc., No. C99-2216, 2004 WL 2370633 (N.D. Cal. Oct. 21, 2004) (court examined CBA in deciding that UPS violated ADA and California state anti-discrimination laws in class action suit brought on behalf of hearing-impaired drivers).

UPS simply has not established that resolution of any or all of Plaintiff's state law failure to accommodate claims "hinges upon" the interpretation of UPS's CBA. Further, Plaintiff's disparate treatment discrimination claims are focused on UPS's "conduct and motives" and do not require interpretation of the CBA. See Hawaiian Airlines, 512 U.S. at 261. Thus, UPS has not shown that it is entitled to summary judgment based on its Section 301 preemption argument.

**B. Failure to Accommodate**

In Counts Seven, Eight and Nine, Plaintiff alleges that UPS violated FEPA, RICRA and RICRPDA, by failing to accommodate his disability. In particular, Plaintiff asserts that UPS unlawfully removed him from his driver position and that it was legally obligated to accommodate him by allowing him to continue driving non-DOT trucks weighing less than 10,001 pounds GVW.

Plaintiff asserts that he could do this as a "fixed route driver on an existing route or a modified route" and also as a "cover driver, only driving small [non-DOT] vehicles." Pl.'s Mem. in Supp. at pp. 10-11.

UPS contends that it is entitled to summary judgment on Plaintiff's failure to accommodate claims for two primary reasons. First, UPS contends that Plaintiff's proposed accommodations involving fixed routes would violate the seniority and bidding provision in the CBA and thus are not "reasonable accommodations" as a matter of law. See U.S. Airways, Inc. v. Barnett, 535 U.S. 391 (2002). Second, UPS contends that the proposed cover driver accommodations would not lawfully constitute a "reasonable accommodation" because they would either require UPS to create a new "small vehicle cover driver" position or to "radically restructure" the job.

For the reasons discussed below, UPS has not shown an absence of genuine "trialworthy" factual issues with regard to Plaintiff's failure to accommodate claims. FEPA makes it unlawful for an employer to refuse to reasonably accommodate an employee's disability unless the employer can demonstrate that the accommodation would pose a "hardship" on the employer's business. R.I. Gen. Laws § 28-5-7(1)(iv). Similarly, RICRPDA makes it unlawful for a covered employer to discriminate in employment against a disabled employee "who with reasonable accommodation and with no major cost can perform the essential functions of the job in question...." R.I. Gen. Laws § 42-87-3(2). To the contrary, RICRA does not expressly contain any reasonable accommodation requirement and Rhode Island's courts have not, to this Court's knowledge, inferred such a requirement from its terms. See R.I. Gen. Laws § 42-112-1. UPS argues that it is entitled to summary judgment on Count Eight (RICRA failure to accommodate) since RICRA contains no duty

of accommodation. Plaintiff completely fails to address this argument and thus this Court can only conclude that Plaintiff is abandoning Count Eight, his RICRA failure to accommodate claim, and is proceeding solely under FEPA (Count Seven) and RICRPDA (Count Nine) on such claim.

Using the ADA as a guide, District Judge Smith of this Court recently outlined the elements of a failure to accommodate claim under RICRPDA and FEPA.[3] He held that a plaintiff must prove the following three elements: (1) that he is a person with a disability; (2) that he was nevertheless able to perform the essential functions of his job with reasonable accommodation and at no "major cost" (RICRPDA) or "hardship" (FEPA) to his employer; and (3) that the employer, despite knowledge of the disability, did not reasonably accommodate it. Kriegel v. Rhode Island, 266 F. Supp. 2d 288, 297 (D.R.I. 2003), citing Carroll v. Xerox Corp., 294 F.3d 231, 237-38 (1st Cir. 2002). For purposes of this Motion, UPS has conceded that Plaintiff has a covered disability, and it had knowledge of the disability. UPS does not specifically argue "major cost" or "hardship" but rather focuses its argument on the "reasonableness" of the requested accommodations and whether Plaintiff can perform the "essential functions" of the driver position.

In U.S. Airways, 535 U.S. 391, a disabled cargo handler brought suit against his employer, U.S. Airways, under the ADA for failing to honor his request for permanent reassignment to a less strenuous mail room job as a reasonable accommodation. After he was injured, the Plaintiff in Barnett utilized his seniority to transfer to the mail room job but was later "bumped" out by a more senior employee. The plaintiff asked U.S. Airways to make an exception to its seniority system as

---

[3] The Rhode Island Supreme Court has also adopted the ADA framework for analyzing a failure to accommodate claim under FEPA. See DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13, 27 n.14 (R.I. 2005), citing Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999).

a reasonable accommodation to his disability and allow him to remain in the mail room job. U.S. Airways refused to do so. The Supreme Court ruled in favor of U.S. Airways and held that "ordinarily" the ADA does not require an employer to grant a reasonable accommodation that would violate the rules of an established seniority system. Id. at 406. It held that such a showing "warrants summary judgment for the employer – unless there is more," i.e., "special circumstances" demonstrating that the job assignment is "nonetheless reasonable." Id. As examples, the Supreme Court stated that an employer's departures from or exceptions to its seniority system may establish such "special circumstances." Id. at 405.

Plaintiff has presented a legally sufficient evidentiary basis from which a reasonable jury could find that he has established the existence of "special circumstances" as set forth in U.S. Airways. Further, Plaintiff has identified additional genuine disputes of material fact regarding other potential accommodations that would not be in conflict with the CBA's seniority and bidding procedures. UPS understandably attempts to look at this issue through a too-narrow scope. UPS argues that only three fixed-route drivers currently utilize smaller non-DOT trucks in the Warwick facility and that Plaintiff does not have sufficient seniority to successfully bid on such a position. Plaintiff does not, however, argue that UPS must violate seniority and reassign him to one of those three existing routes. Rather, Plaintiff identifies other potential accommodations, and UPS simply has not met its burden under Fed. R. Civ. P. 56(c) to establish the complete absence of any genuine issues of material fact as to such accommodations.

At oral argument, UPS's attorney asserted that the "only issue" was whether Plaintiff has the seniority to bid into a route that either exclusively or largely uses a smaller non-DOT vehicle. UPS's

argument, however, improperly limits the scope of analysis to existing routes and ignores that the nature of an employer's accommodation obligation may require it in certain circumstances to alter the status quo to, in effect, give some level of "preference" to a disabled employee. See U.S. Airways, 535 U.S. at 397 (ADA specifies that preferences will sometimes prove necessary to achieve the ADA's basic equal opportunity goal).

With regard to the fixed route option, UPS's counsel argued at the hearing that such routes are "largely the same" day to day and that the goal is for fixed routes to take between 8 and 9.5 hours to complete each day. However, he conceded that even fixed routes are subject to constant reshuffling based on anticipated demands. In particular, stops may be dropped from or added to a fixed route from day to day to balance workload. UPS utilizes a package dispatch supervisor to monitor route size and implement any necessary adjustments by use of a computer program.

Plaintiff indicates that, as of the 2005 annual bid, he had enough seniority to bid on 82 of the approximately 220 fixed bid routes generally operating out of the Warwick facility. Pl.'s SDF, ¶ 50. Plaintiff contends that there is a "trialworthy" issue as to whether UPS could reasonably accommodate him by allowing him to use a smaller vehicle on one of those 82 routes. In support of his argument, Plaintiff points out that UPS has the right to and does adjust fixed routes on a daily basis. UPS also has the management right to decide what size truck to assign to any fixed route. The parties agree that if a route is changed by 50% or less, it does not become a new route open to bid. Def.'s Ex. F; Reddy Dep. p. 74. The Union's Business Agent, Kevin Reddy, testified that if a route is changed by 50% or less, the driver would have the right to stay on that changed route at least until the annual bid. Id. at pp. 75-77. See EEOC, 149 F. Supp. 2d at 1126 (UPS "does not need the

union's approval for changing a route (up to fifty percent) or to add a new route."). Finally, Mr. Reddy testified that the Union would not object to UPS assigning Plaintiff to a route with a small vehicle, even if a more senior driver complained, if it was an "ADA thing." Reddy Dep. pp. 27 and 71.

In addition, Plaintiff argues that UPS's argument for summary judgment is further undercut by evidence that UPS has made similar accommodations to disabled employees in other facilities. For instance, in EEOC, 149 F. Supp. 2d at 1137, the court made findings after a bench trial that a vision-impaired driver who lost her DOT card was allowed to resume her driving duties in smaller trucks as an accommodation. By "agreement," UPS returned the driver to the route she held prior to her vision impairment (loss in one eye) and the route was "removed from the normal selection procedures." Id., Finding 91. UPS assigned a smaller P-50 truck to the route. This P-50 truck, along with a spare, was transferred from another UPS facility to the plaintiff's facility because there were no smaller P-50s assigned to the Plaintiff's facility at the time. Id., Finding 94. There were also findings in the EEOC case that UPS adjusted the volume of the accommodated driver's route from time to time as necessary. Id., Finding 95. Moreover, in Bates, 2004 WL 2370633 at *13, the court made a similar finding after a bench trial that "UPS has made exceptions to DOT physical qualification standards for individuals with impaired vision, diabetes, and other impairments besides hearing loss." (emphasis added). It was noted from UPS's discovery responses in Bates that there were "87 individuals who could not meet the DOT physical requirements but whom UPS allows to drive package cars." Id.

As to local exceptions, Plaintiff points to Jim Whittaker, a deceased UPS driver who had an injured back, as one example. Aff. of Izzi at ¶ 6; Reddy Dep. p. 67. Mr. Whittaker told Plaintiff that UPS created a "lighter" route for him, which was not open for bid, to accommodate his back injury. Id. Mr. Reddy testified that Mr. Whittaker received an accommodation for his back injury that involved a Logan Airport delivery, and he received a specially negotiated pay rate which may have been somewhere between a full-time driver rate and an inside rate. Reddy Dep. pp. 65-67. This evidence, and that discussed above, is sufficient to establish the existence of a genuine issue of material fact as to reasonable accommodation.

UPS similarly has not shown that it is entitled to summary judgment as to Plaintiff's proposed cover driver accommodations. It is undisputed that Plaintiff has sufficient seniority to bid on a cover driver position. However, UPS argues that assigning Plaintiff to drive only smaller trucks as a cover driver would improperly require UPS to create a "new position." While creating a "new position" is generally not considered a reasonable accommodation, see Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir. 2001) (employer not required by ADA to create a new job for a disabled employee), there is an issue of fact as to whether Plaintiff's cover driver proposals would require UPS to do so.

For purposes of this Motion, UPS conceded at the hearing that "every day" at least one cover driver operates a smaller non-DOT truck. As suggested by the job title, these drivers "cover" routes for fixed route drivers who may be out sick, on vacation or otherwise unavailable. Cover drivers can also be used to "cover" increases in package volume such as during the "peak" holiday season. Cover drivers can also be assigned inside duties. UPS argues that an essential function of the cover

driver position, if not the primary one, is "the ability to flexibly cover whatever route is needed that day." Def.'s Mem. in Supp., p. 17. This need for flexibility, however, cuts both ways. It also means that UPS has the management flexibility to utilize cover drivers as it sees fit. Cover drivers do not bid on a specific assigned route, but rather only bid on the general position of cover driver.

In Morton, 272 F.3d 1249, the Ninth Circuit Court of Appeals reversed a grant of summary judgment for UPS due to the existence of genuine issues of material fact as to accommodation. The plaintiff in Morton was a hearing-impaired driver employed by UPS in Phoenix, Arizona, who could not obtain a DOT card. UPS refused to promote her to a driver position because she could only lawfully drive smaller non-DOT trucks. The Court of Appeals held that there was an issue of fact as to whether or not she could be reasonably accommodated in a "swing" or cover driver position. Id. at 1255. It stated that even if UPS had to "occasionally" assign the plaintiff to warehouse work as a swing driver because no smaller truck work was available, that fact did not establish the plaintiff's inability to perform the essential functions of the swing driver job. Id.

The Court of Appeals in Morton concluded that summary judgment was warranted because a reasonable juror could determine that the ability to drive larger DOT trucks was not an essential function of a swing driver position. Id. at 1256. See also EEOC, 149 F. Supp. 2d at 1171 (court concluded that flexibility to fill in for any driver on any size truck was not an essential job function otherwise UPS's vision protocol "was a sham and dangled false hope"). UPS argues that Morton is factually distinguishable because of significant differences both in the process for assigning drivers at the Phoenix facility and the types of routes there as compared to the Warwick facility. While UPS

may ultimately be correct that Morton is distinguishable, the distinctions claimed by UPS present factual questions not amenable to resolution under Fed. R. Civ. P. 56.

While UPS may ultimately prevail after trial, it has not established the absence of all genuine issues of material fact as to reasonable accommodation necessary to justify the entry of summary judgment against Plaintiff. For the reasons discussed above, this Court recommends that UPS's Motion as to Counts Seven, Eight and Nine be DENIED.

**C. Disparate Treatment**

In Counts One, Two and Three of his Complaint, Plaintiff alleges disparate treatment in violation of FEPA, RICRA and RICRPDA. Unlike Plaintiff's failure to accommodate claim, the disparate treatment claim requires proof of intentional discrimination by UPS against Plaintiff due to his disability. UPS argues that it is entitled to summary judgment because Plaintiff was not treated differently than any other similarly-situated UPS employee without diabetes. In particular, UPS argues that Plaintiff "is being treated exactly like any UPS employee in Rhode Island with similar seniority but without a DOT card." UPS's Mem. in Supp. at p. 11.[4]

UPS's argument is off target. UPS asserts that Plaintiff "is free to bid on an air driver position but chooses not to." UPS's Mem. in Supp. at pp. 11-12. Air drivers deliver UPS Next Day Air packages which are generally smaller and must be delivered by 10:30 a.m. Id. at p. 6. Air drivers utilize smaller non-DOT trucks and either drive part-time or work full-time and perform both

---

[4] UPS presumably qualified its argument with the phrase "in Rhode Island" because there is evidence that UPS has, at least in other locations, accommodated disabled package car drivers who did not hold DOT cards. See Bates, 2004 WL 2370633 at *13.

driving and non-driving warehouse work. Id. Air drivers are paid less per hour than the hourly rate paid to full-time package car drivers. Id.

While Plaintiff may currently have the option to bid on an air driver position, that was not always the case. Plaintiff's Division Manager, Kenneth Miranda, has testified by affidavit that he learned of Plaintiff's diabetes in October of 2002. Aff. of Miranda, ¶ 3. Mr. Miranda was the Division Manager of UPS's Warwick facility from September 2002 to May 2004, and was responsible for the day-to-day operations of the facility. Id. After UPS learned of Plaintiff's diabetes, it is undisputed that Plaintiff was promptly relieved of all driving duties, not just driving duties involving DOT-regulated trucks. Mr. Miranda states that he "was confident" that Plaintiff "would have to be moved to a full-time warehouse position" because of his diabetes. Id. ¶ 5. Mr. Miranda indicates that this decision was based on his "past experience at UPS," understanding of UPS policy and DOT regulation, and personal concerns about the "well-being" of Plaintiff, the community and UPS. Id. ¶¶ 5-6. Mr. Reddy, the Union Business Agent representing Plaintiff, testified that Mr. Miranda told him that "we cannot let [Plaintiff] drive the truck when he's insulin dependent. Would you want [Plaintiff] out there driving the truck where something happened to him?" Reddy Dep. p. 36. Finally, Mr. Miranda did not investigate the feasibility of Plaintiff driving a smaller non-DOT truck, despite the long-standing existence of UPS's Diabetes Protocol and inquiries from Plaintiff about doing so. Id. ¶¶ 8-9.

The Diabetes Protocol was adopted by UPS in order to address the obligation of "reasonable accommodation under the ADA or applicable state law." Pl.'s Ex. B. The protocol provides for an

individualized assessment of the medical condition and driving record of diabetic employees in order "to determine their ability to safely operate UPS vehicles weighing 10,000 pounds or less." Id.

Plaintiff has presented sufficient evidence to create a "trialworthy" issue as to disparate treatment. UPS has not presented any evidence that Mr. Miranda or anyone else at UPS applied the diabetes protocol to Plaintiff's case in a timely fashion, or that Plaintiff's superior, Mr. Miranda, was even aware of the protocol. Plaintiff asserts that the protocol was not applied to him until after he filed an administrative charge of disability discrimination against UPS in May of 2003. This timing is consistent with UPS's letter to Plaintiff notifying him of the results of his evaluation under the protocol. Pl.'s Ex. F. Plaintiff was advised by the September 23, 2003 letter that his situation had been "carefully evaluated" by UPS "over the last several weeks" and that he was found to be qualified to operate smaller non-DOT trucks. Id. That decision came nearly one year after Plaintiff was initially relieved of all driving duties.

Contrary to UPS's argument, there is a genuine issue of fact, at least for the period October 2002 to September 2003, as to whether Plaintiff was treated "exactly like" any other driver with similar seniority but without a DOT card. Presumably, a non-diabetic driver with similar seniority and no DOT card would not have been disqualified from all driving duties for nearly one year. One could reasonably conclude from Mr. Miranda's Affidavit that he determined that Plaintiff's diabetes and resulting loss of his DOT card automatically disqualified him from all driving. However, UPS's diabetes protocol indicates that UPS had abandoned this "past" black-and-white policy in favor of a more individualized assessment related to "reasonable accommodation under the ADA or applicable state law." Pl.'s Ex. F.

Although UPS was required by federal law to automatically relieve Plaintiff from driving trucks exceeding 10,000 pounds GVW, it was not required to do so as to smaller non-DOT trucks. Again, one can reasonably infer from Mr. Miranda's Affidavit that he, acting on UPS's behalf, believed that a "blanket exclusion" from all driving applied to diabetic employees based on federal law, UPS policy and his own personal safety concerns. Aff. of Miranda, ¶¶ 5-7. Generally, such blanket exclusions based on disability are unacceptable under disability discrimination laws such as the ADA and similar state laws. See Sarsycki v. United Parcel Serv., 862 F. Supp. 336, 341 (W.D. Ok. 1994) (ADA required an individualized assessment of insulin-dependent diabetic driver). "An individualized assessment is absolutely necessary if persons with disabilities are to be protected from unfair and inaccurate stereotypes and prejudices." Bombrys v. City of Toledo, 849 F. Supp. 1210, 1219 (N.D. Ohio 1993) (blanket disqualification of insulin-dependent diabetics as candidates for police officer positions violates ADA).

Although Plaintiff's case is primarily focused on his failure to accommodate claims, this Court cannot conclude on the current record that his disparate treatment claims fail as a matter of law. UPS has not established under Fed. R. Civ. P. 56(c) the absence of any "trialworthy" issues arising out of the disparate treatment counts. Thus, this Court recommends that UPS's Motion as to Counts One, Two and Three be DENIED.

## Conclusion

For the reasons stated, I recommend that Defendant's Motion for Summary Judgment (Document No. 43) be GRANTED in part and DENIED in part. In particular, this Court recommends that Defendant's Motion be GRANTED as to Counts 4, 5, 6 and 8, and DENIED as to

the remaining Counts 1, 2, 3, 7 and 9. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. Fed. R. Civ. P. 72(b); Local Rule 32. Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's decision. United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1990).

LINCOLN D. ALMOND
United States Magistrate Judge
October 28, 2005